## WRIGHT v. STEWART et al. |

### (Circuit Court, D. Missouri, S. W. D. June 14, 1904.)

1. CONSPIRACY TO DEFRAUD—EVIDENCE.

Where a conspiracy is charged to swindle, by obtaining under false pretenses money of a third party by means of a "fake" foot race, evidence of the separate acts and declarations of the alleged members thereof may, in the sound discretion of the judge, be admitted in advance of proof, prima facie, of the existence of the conspiracy, where, tracing step by step the footprints of each, they converge to a common center of such purpose.

2. SAME—ANTERIOR AND SUBSEQUENT ACTS AND DECLARATIONS.

In a civil action, founded on a conspiracy to defraud the plaintiff and steal his money, the conduct, acts, and declarations of the conspirators, in pari materia, from the inception of their operations, may be inquired into for the purpose of demonstrating the character of the particular act complained of, limited to those of a like character in furtherance of a common enterprise. Likewise, where the question involved is as to the fraudulent character of the given transaction, and the guilty knowledge of the alleged conspirators, evidence of subsequent like acts and transactions, closely allied in point of time, before the end of the conspiracy, may be admitted.

3. SAME—PARTIES TO CONSPIRACY—BANK.

A banking corporation may become a party to a fraudulent conspiracy, the same as a natural person, with like responsibility. It and its managing officers may legitimately receive on deposit the moneys of a gambler, with reason to believe it was won in gaming or by other questionable means; but they cross the line of permissibility when, with a knowledge that such depositor is obtaining the money by fraud or theft, they do acts in aid of the wrongful means by which the money is obtained.

4. NOTICE—COMMON NOTORIETY.

Proof of the notoriety of a fact in the neighborhood of the party to be affected thereby is competent to carry home to him knowledge.

5. ACTION—RIGHT TO BRING—DISTINCTION BETWEEN "IN DELICTO" AND "IN PARI DELICTO."

In an action to recover money from defendants, obtained from the plaintiff by means of inducing him to believe that a foot race was "fixed," so that one party was sure to win, and persuading the plaintiff to participate to the extent of betting the money of one side to the simulated race as if it were his own, on the assurance that he should receive 20 per cent. of the sum won, he being ignorant at the time that the money all belonged to the parties on both sides of the pretended wager, *held* that, although he was in delicto, by consenting to act in such deceitful attitude, he was not in pari delicto with the conspirators, and is therefore entitled to recover back the sum of $5,000 which the conspirators persuaded him to intrust to the possession of one of them as a stakeholder, not to be bet on the race, but to be used to make a showing by the stakeholder in the event of a count of the stake money being called for by one of the feigned bettors.

6. SAME—MONEY HAD AND RECEIVED—DEMAND OF RETURN OF MONEY BEFORE RACE.

Where, in the instance above stated, the plaintiff demanded back his money before the pretended race was run, action will lie for its recovery, and the plea of moral turpitude constitutes no defense.

(Syllabus by the Court.)

¶ 4. See Evidence, vol. 20, Cent. Dig. § 228.

Action by H. S. Wright against Joseph C. Stewart and others. Judgment for plaintiff.

McReynolds & Halliburton and H. W. Currey, for plaintiff.

W. R. Robertson and Howard Gray, for defendants.

PHILIPS, District Judge. A trial by jury having been waived by written stipulation of the parties filed herein, this cause has been submitted to the court on the pleadings and the evidence. The plaintiff is a citizen of the state of Texas, and the defendant bank, an incorported bank under the laws of the state of Missouri, is located at Webb City, Jasper county, Mo., and the defendant Joseph C. Stewart was president and the defendant James P. Stewart was cashier of said bank at the times hereinafter stated, and were citizens of the county aforesaid, and the principal stockholders and practical managers of said bank.

The petition, in substance, charges that at the dates thereinafter mentioned, and prior and subsequent thereto, the defendants, together with Robert Boatright, Ed. Ellis, C. F. Landers, William Segrider, L. E. Hindman, —— Maloney, R. H. Williams, George Thompson, Burt Brumley, Harry Wasser, Bud. Jillet, and others, were combined and confederated together in managing and operating fake gambling devices at said Webb City, to wit, fake foot races and other games, for the purpose of obtaining possession of the money and property of strangers who had no knowledge of their games, with the intent to feloniously steal, take, and carry away such money and convert the same to their own use; that they were engaged in person and by agents in enticing strangers to come to Webb City and engage in such games, for the purpose of getting possession of the money and property of such strangers, and converting the same to their own use; that such foot races were so arranged that it was impossible for any person outside of defendants and their agents to win in said races, said races being known as "fixed" races; that prior to the 6th day of September, 1901, the defendants and their confederates conspired and confederated together to induce and entice the plaintiff to come from his home in Cooper, Tex., to Webb City, for the purpose of betting the money of Robert Boatright and others belonging to said combination on a foot race, to be arranged and to be run by the defendants Landers and Segrider as opposing runners, for the purpose of defrauding and swindling the plaintiff out of his money and property, under pretense of winning the same; that by various devices and false pretenses and representations they induced the plaintiff, on the 6th and 7th days of September, 1901, to place in the hands of said Boatright as stakeholder on such foot race $5,100, said foot race to be arranged by the defendants and confederates, said defendants and their confederates representing that it was necessary for the plaintiff to put the amount of money in Boatright's hands until the stake on said race could be counted, agreeing with plaintiff that if he would do so, as soon as the money was counted, it would be returned to him; that in reliance upon said statements and inducements the plaintiff placed said sum of money in Boatright's hands

for the purpose aforesaid; that he made demand of Boatright for his money before the pretended race was run, but the defendants and their confederates failed and refused to return said money, or any part thereof, to the plaintiff, but stole, took, and carried the same away, and converted the same to their own use, pretending that plaintiff had bet said money and lost it on said foot race; that the plaintiff did not bet his said money, or any part thereof, on said foot race, but placed the same in Boatright's hands solely so that Boatright could show that said purse was full and complete. The petition charges that the defendants, the Stewarts and the bank, were at said times engaged in assisting their said confederates and co-conspirators in enticing and inducing plaintiff to put his money in said Boatright's hands, with knowledge that the plaintiff was bound to lose any and all moneys so placed in the hands of Boatright. The petition then proceeds to state the manner in which the plaintiff drew his money on sight drafts in favor of the defendant bank, and how it was then placed with the said Boatright. It then charges that said foot race was arranged for the sole purpose of obtaining from the plaintiff fraudulently the possession of his money, and stealing and converting the same to the use of the conspirators, and falsely claiming that the plaintiff had lost his money on said foot race.

That the conspiracy charged in the petition existed between Boatright and the parties named as co-conspirators with him, other than the defendants, to defraud strangers to their fraudulent combination by means of the device and scheme of conducting fake foot races, conducted ostensibly under the auspices of a so-called athletic club at Webb City, controlled and managed by Boatright as president, is fully established by the evidence. This organization had its inception as far back as 1899, and continued its operations until perhaps 1902. All of the parties named may not have been connected with this fraudulent enterprise from its inception, but they came into it from time to time as it became useful to admit any one of them. Boatright was the chief organizer, director, and controlling mind of the dishonest and cunningly devised scheme. He acquired the sobriquet of "Buckfoot," and he and his co-conspirators and subalterns went by the name of the "Buckfoot Gang." The devices employed for inveigling subjects to be preyed upon by their scheme were various, suited to the best method of influencing their victim to come to Webb City and be entrapped into parting from his money. These devices and deceitful representations all had one objective point—to decoy the prey to Webb City to be manipulated and controlled by the genius of Boatright, the master mind. No one outside of the gang of conspirators was ever allowed to win any money on said pretended foot races, or to get his money back, no matter under what assurances or circumstances he was induced to intrust it to the hands of any one of the confederates. Boatright had his emissaries and "strikers" scattered over the country, into adjacent and nonadjacent states. These men were shrewd, plausible, and resourceful scoundrels. They seemed to have made themselves familiar with the character and gullibility of the men they sought to entrap and despoil, so that the method pursued to bring within their toils one man in a

given locality would be a wholly different expedient resorted to in respect of another subject.

One man, for instance, residing in the state of Iowa, a farmer and cattle dealer, possessed of some wealth, with extensive credit at his local bank, would be approached by an emissary of the "Buckfoot gang," who would obtain audience by informing him of a "bunch" of cattle in the vicinity of Webb City suitable to his wants, which, it was represented, could be purchased at a low figure. Discovering a yielding disposition of the farmer to "bite," this persuader would cunningly suggest to him the advisability of taking along with him a letter of credit or draft, as the case might be, from his local bank, to be used in case of effecting a purchase of the cattle. This agent would then accompany the party to Webb City, and bring him face to face with Boatright, when, according to prearranged plan, the matter of foot races would be suggested, and a plausible story unfolded by which money could be made by a fake foot race, and that Boatright for certain reasons did not want it known to parties who would bet on the opposing foot racer that he was betting moneys of the athletic club on the other racer, and therefore they desired this stranger to bet the money of the club for Boatright, who would place the money for such purpose in the stranger's hands to bet as if it were his own. Perhaps the stranger would be informed that the race was so fixed that Boatright's man was certain to win. Then the conspirators, with a perfect understanding between themselves, would conduct the stranger into what is known in the evidence as the "16 to 1" saloon, their place of rendezvous, whereupon some one would bring up the subject of foot racing and propose to bet on a racer, who himself was a member of the gang, whereat some one or other of the gang would accept his offer and bet on another racer, also a member of the gang. Thereupon the betting would begin swift and furious. This stranger, provided with say $3,000 by Boatright, would put it up against $3,000 ostensibly bet by some one of the gang on the other racer. Boatright was the stakeholder and tally keeper of the bets. Thereat intense excitement would be feigned by the conspirators, and the betting would run higher and higher. To meet the large additional sums offered as a bet by the opposition side, Boatright, who kept the stakes in a convenient satchel, would take money therefrom and slip it to the stranger, and after this was bet the same money would be slipped back into the satchel by Boatright. When this mock performance, which the stranger believed was genuine, had reached a certain point, some one of the gang would claim that he had bet $500 not shown by Boatright's tally, and demand a count of the stake money. Others would join in the clamor, until the demand would become an uproar. Whereat Boatright, feigning great alarm, would pluck the stranger to one side and whisper to him that those fellows were desperate men, and, as a count would disclose a shortage in the stake, his life would be imperiled if something were not at once done to relieve the situation. Sometimes he would make the pathetic appeal that he was the support of dependent parents, and it would bring ruin and sorrow, should the enraged crowd call him to account. Boatright was so much of an actor as to show by his cun-

ningness and manner great distress and perturbation of mind. Finally, as a dernier resort, he would demand of his victim that he go at once to the bank of the defendants, and on his letter of credit, or whatever means he had, draw through the bank the required sum to meet the deficit, and bring it forthwith to Boatright to be placed in the satchel. Some one of the gang would follow the stranger closely to the bank to watch and urge him on. As soon as the stranger's money got safely into the capacious maw of the proverbial satchel, the clamor for a count would cease, and the stranger would demand of Boatright the return of his money, as he was not betting it on the proposed foot race. Boatright would put him off by saying the other fellows were watching him, so that it was not safe to undertake to take the money from the satchel and hand it to the stranger, and, perhaps, would suggest that the race be brought off at once before further trouble. Before the dazed victim could collect his wits, he would almost be forced into a closed carriage and driven to the race course, where the pretended race would be gone through with, with the prearranged result among the conspirators that the man Boatright's money was supposed to be placed on would fall down and lose the race. One of the witnesses testified that there was a convenient ridge raised across the race course where Boatright's man always conveniently stumbled and fell violently to the ground, losing the race, of course. In some instances the gang would insist that the stranger had in fact bet his money on the race and lost, or Boatright would put him off when he demanded his money back, with the statement that he would return it to him as soon as it was safe, out of sight of the excited crowd, to do so. This return was never made and the stranger lost his money.

Another subject would be found in some other locality, and inveigled to Webb City by some other plausible device, and be brought into the meshes of the conspirators at this 16 to 1 saloon, and induced to act as stakeholder of the feigned bets on such fake foot race. After the form had been gone through of placing these ostensible bets with this stakeholder, some one of the gang would suggest that, as he was a stranger to them, he ought to furnish some security to answer for the stakes; and thereupon he would be piloted, by some one of Boatright's lieutenants, to the defendant bank, where on his letter of credit, draft, or check he would draw say $5,000, and bring it over and put it in the noted satchel, which satchel would be taken charge of by Boatright. The same process would be gone through with respecting the race, with the same result as above indicated; and when this stranger immediately went back to the bank to countermand the collection of his check or draft the "gang" would follow him there, and in the presence of the bank officers vociferously assert that he had lost his money on the race, and threaten him with drawn pistols, so that the man would deem himself fortunate to get away with his life. Another subject, for instance, would be brought under the influence of Boatright by the representations of one of his lieutenants to the effect that a certain deserving fleet-footed athlete, who had won races for the club, had not been allowed by the members thereof to get any of the money he had won; that Boatright wished

that justice might be done him by allowing him to win money from "the other fellows"; that all that was desired of him was to bet the money furnished by Boatright to enable this deserving racer to get even. Supposing that there were two sides, in fact, to the race, he would suffer himself to be overreached; and they would get the stranger by some means to obtain the money from the bank and intrust it to Boatright's satchel, with the usual result.

In the case of this plaintiff the evidence, in substance, shows that he was a farmer, 53 years of age, residing in Delta county, near Cooper, Tex., in September, 1901; that he was at that time deputy sheriff of that county. Boatright sent a member of this "gang" by the name of Hineman, to Dallas, Tex., to enlist the services of a man named Hodges. As this victim was out of the way, Hineman met with a man named Duncan, whom he knew; and, after he had informed Duncan of his scheme, that he wanted a man who could go to Webb City, backed by a letter of credit from some bank, he obtained an introduction to the plaintiff through Duncan. Hineman stated to the plaintiff, in substance, that in conducting one of their boxing contests under said club they had a man against whom they had been betting, and when they wired to his home respecting his credit they ascertained he had no credit, and they quit betting; that he was hunting for a man who could carry a letter of credit or draft, so that, "if they wired home to the home bank, he would stand up under the wires." He asked the plaintiff if he could obtain the requisite letter of credit from bank, and being informed that he could, to the extent of $5,000, he was told by Hineman there were some miners at Webb City with plenty of money; that he had a foot racer at Webb City who stood very high as a racer, and they could match him and win some money; that what they wanted with the plaintiff was to bet the money which Boatright would furnish, but didn't want his (Boatright's) name known in it; and that they would give the plaintiff 20 per cent. of the winnings. When the plaintiff consented to go, Hineman asked him if he did not have a large white hat he could wear, indicating that he was a Texas cowman, or something of that kind. The plaintiff answered that he wore a white hat sometimes, and Hineman told him to get it and wear it. Accompanied by Duncan they came by train to Webb City, Hineman preceding them from Monett to Webb City. When the plaintiff and Duncan reached Webb City, Hineman met them at the platform, and the plaintiff was told to go with some man to a park between Webb City and Joplin, which he did. The next morning Hineman brought Boatright to this park, where he met the plaintiff. Boatright told the plaintiff that he had the Ellis party outmatched with his man, and that they could win some money, and he gave the plaintiff $3,300 to bet, as he did not want his name known in it. He was directed by Boatright to deposit this $3,300 in the defendant bank, as that was the bank where they did all of their business, and it was a good place for the plaintiff to get money on his letter of credit if he wanted it. The evidence also tends to show that the two pretended racers were at this meeting in the park, and that the plaintiff was given to understand that Boatright's man was the faster of the two, and that it was so arranged

that he was to win the race. Boatright directed the plaintiff how to find the bank, and Hineman accompanied him and told him that he would make a stop right in front of the bank, and there turn and walk across the street. "I would know that was the bank." Which direction the plaintiff obeyed, and deposited in the bank in his name the money given him by Boatright. Boatright told him, after he had deposited the money, to go over to the 16 to 1 saloon. When he deposited the money with the bank, he told the banker that he "might want to sport some. I got a letter of credit here, too, and I might want some money on it, too. He [meaning the banker] looked at it, and said I could get it, and I told him my name, and he gave me a deposit check of some kind for it, and I went over to the 16 to 1 saloon." The witness Duncan, who accompanied the plaintiff over to the bank at the time he made the deposit of the $3,300 and presented his letter of credit, testified that the plaintiff then asked the cashier of the bank if he was acquainted with Boatright, and, on his answering that he was, the plaintiff said: "I am having some dealings with him. I am having some business with him—with Boatright," or something. "Is he perfectly responsible for what he does and says?" Mr. Stewart said: "Well, he is a patron of our bank, and we think he is." When the plaintiff reached the saloon he was introduced to Boatright by Landers as if he had never seen him. He had been introduced to Landers at the park by the name of Segrider. Landers turned out to be the other foot racer.

Plaintiff further testified that he did not know who mentioned matching a foot race, but believed it was Landers, whereat the man, Ed Ellis, said he was there for that business, that he had a man there who could outrun anything from Texas. After he was introduced to several parties standing around in the saloon, he was conducted upstairs into what was called the "club room." When they reached the club room Ellis wanted to match a race for $6,000 for 50 yards. He finally agreed with Ellis on a 50-yard race for a $5,000 stake, and put up $2,500 as a forfeit. Some kind of form of written agreement was presented and signed there respecting this race. Thereupon Ellis said he must go to the bank and get some money; and Boatright told plaintiff to go to the bank and make a bank showing as if it were his money. He went to the bank and told the cashier that he was sporting a little now, and that Boatright was to hold the stakes, and he said to the banker, "I guess he is all right?" The banker answered, "Yes, Boatright is all right." He thereupon drew $3,000 on a check and went back to the 16 to 1 saloon, into the club room, where the $2,500 forfeits were put up. Others of the gang were there. One of them pretended to be drinking and wanted to bet some. Boatright nodded to him to take the bet, $300 with him, and $200 with some others. Thereupon the crowd said they would get more money, and wanted to know if the plaintiff had any more. When they went out Boatright gave him $3,000 or $4,000, and said that he must go to the bank and make a showing, as the crowd might be watching him and catch him furnishing him the money. Thereupon he went to the bank and checked out $1,000 of his own money on his letter of credit. This he took over to the club and bet with

Ellis. Thereupon Ellis took a large bundle of money out of his bosom and offered to bet, and Boatright told him he must go to the bank and check some more. The man Landers had gone to the bank with him when he drew the $1,000. Boatright handed the plaintiff $6,000, and told him to go to the bank and check some more as the crowd would be watching him. When he reached the bank the bank was closed, and upon information of this fact Ellis returned with him and rang at the door, and was told by a man in charge that he would not open the bank any more that evening. When he informed Boatright of what had been done, Boatright had him leave the money with him until the next morning. The plaintiff was sent over to Joplin to stay all night, accompanied by Duncan and Landers. After a while Hineman came over and told him that "Boatright was ribbing those fellows up there to bet a good deal to-morrow; that if we could win to-morrow we could get a right smart more to-morrow." Returning to the 16 to 1 saloon the next morning, Boatright nudged him and took him up into the club room, when he handed the plaintiff $4,000 and again told him to go and make a bank showing, that he had better check some. Boatright told him: "They will be watching you. If they find you are not betting your own money, it will be all off. They won't bet any more." He then went to the bank, accompanied by Landers, who told him he better check the other $4,000 out. "They are watching you; you better check it." Finally he told Landers he would check it, but he was not going to bet it. Thereupon Ellis came in and asked if the plaintiff had checked any yet. Landers said: "Now, you will just have to check. They are watching you." Thereupon he checked out the remaining $4,000. Ellis, who was standing at the desk, said: "I am going to check more money than you do. I am going to outbet you." This remark was made close to and in the hearing of the cashier of the bank. When Ellis presented his check, the cashier said that he was about out of paper money, and gave Ellis $5,000 in gold in a little sack without counting it. When they returned to the club room the plaintiff told Landers that he could not bet his $4,000; that he was not going to do it; that he had to protect his credit. Landers said: "You must do it. We can win right smart now. If you don't get up enough, it will be the cause of us not winning so much. See here; Boatright gave me $6,000. I will just hold this to protect yours and make you good. You go on. They ain't after betting with me. They want to bet with you. I will hold this to make you good." Thereupon the plaintiff put up all the money he had, and after he had done so this man Landers pulled out his money and said: "Here I call all, God damn you, you got." The plaintiff said he would not bet all that. Landers answered: "Yes, we got a cinch. I am going to call every dollar they got"—and took out a roll from each pocket, which Boatright counted, and "was put up with the money, that took all the $5,000 in gold." Thereupon Boatright got the gripsack and packed all the money into it. When the crowd had gone down stairs, the plaintiff asked Boatright to give him some more money. Boatright told him that there was no use to give him any more; that they were all in with the money they had. To this plaintiff said: "Here, this

fellow put in or caused me to put in my money, and I want my money out of this thing. I see it is a trap now. I want my money out of it." Boatright said: "They are watching me. I didn't know your money was in it. They are watching me, and I can't well get it out now. I will get it directly and hand it to you." The plaintiff told him that he had put up $5,100, which Boatright said he would get out directly when they were not watching him. Boatright went down stairs and put the grip back in a little safe behind the counter and locked it. The plaintiff again applied to him for his money, and sent Hineman and Duncan to him. Again he promised to return it, but failed. At this juncture the plaintiff was hustled into a carriage and driven to the race track, where Boatright was selected as referee and the plaintiff was made one of the judges of the race, and held the string, and Hineman did the starting. When the plaintiff saw the supposed racers at the starting point, he said to Boatright: "This is a job. That fellow is throwing off right now. You can see it. You ought to give me my money now, without this mock way." Boatright said: "No; no." When they had started the plaintiff dropped' the string and turned to Boatright and said: "This is a damned job you fellows put up. I seen it before now." And he again told Boatright that he ought to give him his money. Boatright said he did not know what to do about it; that he did not know whether to run off and leave the grip, or what to do; that "they had him in a hole; that the stakes were short." After their return to the 16 to 1 saloon Boatright again told him he would give him his money as soon as he could get it without their seeing; that they were watching him. Boatright advised him to go to Joplin and put up at a given hotel, and when he got a chance, when they were not watching him, he would get his money and send it to him by Hineman.

The evidence further shows that during the progress of the betting the plaintiff gave Duncan $100, which Duncan put up on the race, and the plaintiff also put up with Boatright his watch, which watch Boatright afterwards returned to Duncan. The plaintiff returned to his home a poorer, but wiser, man. Duncan remained behind and had another interview with Boatright, to see if he could get the plaintiff's money. Boatright laughed over his smartness, by which he had obtained this money.

The only remaining question of fact to be determined is whether or not the defendants were in privity with the "Buckfoot gang." It is hardly to be expected that, if Boatright was sharing the spoils of his ill-gotten gains with the defendants, proof of this fact would be accessible to the plaintiff. It is quite clear, however, that the bank was the beneficiary of the conspirators' gains. The large amount of money obtained by their operations the bank enjoyed as the depository. It reaped the benefit of its use and the exchange. In this civil action, however, it is not essential to show that the defendants received directly a share of the spoils. It is sufficient to show that the defendants aided knowingly in the promotion of the fraudulent enterprise. Felsenthal v. Thieben, 23 Ill. App. 569; Breedlove v. Bundy, 96 Ind. 319; Martin v. Leslie, 93 Ill. App. 44.

130 F.—58

It may be conceded that a banking institution may legitimately receive on deposit the moneys of a gambler, with reason to believe it was won in gaming, or by other questionable means, without accountability to any one save the depositor. But a bank and its managing officers cross the dividing line between what is permissible and what is forbidden when, with the conscious knowledge that the depositor is obtaining the money by fraud or theft, they do acts in aid of the means by which the money is thus obtained from others. When it co-operates with organized conspirators, it becomes equally liable with them, and each of them, to the party wronged for the money it receives on deposit, stolen by the more active conspirators from their victims, and for the money which it consciously obtains from the victim on his letter of credit, draft, or check by reason of the bank's assistance or inducement. A party who encourages or promotes, knowingly, the commission of a trespass or a fraud, is equally liable with the active participants. All are liable in solido. Wallace v. Miller, 15 La. Ann. 449; Irwin v. Scribner, 15 La. Ann. 583; De Donato v. Morrison, 160 Mo. 591, 592, 61 S. W. 641; Waterman on Trespass, vol. 1, p. 23. See note to State v. Hildreth, 51 Am. Dec. 373. A corporation, like this bank, may become a party to a conspiracy to defraud and be held liable as a joint tort-feasor "to the same extent and under the same circumstances as natural persons for the consequences of its wrongful acts, and will be held to respond in a civil action at the suit of an injured party for every grade and description of forcible, malicious, or negligent tort or wrong which it commits, however foreign to its nature, or beyond its granted powers, the wrongful transaction or act may be." Alexander v. Relfe, 74 Mo. 517; Zinc Carbonate Company v. First National Bank (Wis.) 79 N. W. 229, 74 Am. St. Rep. 845.

It is equally well settled that, where there is a conspiracy to commit fraud or larceny, each person in the confederation, though not actually present at the taking and appropriation, is guilty. Commonwealth v. Hollister, 157 Pa. 13, 27 Atl. 386, 25 L. R. A. 349. The bank cannot receive and enjoy the benefits of the ill-gotten gains or the wrongs perpetrated by its members in their official capacity to the detriment of another without being equally liable with its managing officers. That the defendants Joseph C. and James P. Stewart, president and cashier, respectively, of the defendant bank, practically owning all of its stock and managing its affairs, had knowledge at the time of the swindle practiced on the plaintiff that the "Buckfoot gang," with Boatright as the inspiration and directing mind, long anterior to and at the time in question, were engaged in conducting fake foot races and fleecing outsiders, quite satisfactorily appears in this evidence. I am furthermore persuaded that the part played in said scheme by the Stewarts, acting for the bank, was of such character that without its co-operation, or some other similarly situated bank, the scheme of the conspirators would not have been so successfully conducted. It was altogether important, if not indispensable, to the successful operation of the swindlers that, when they had brought their intended victims to the point where their money should be gotten into Boatright's "grip," they should have the assistance of

the superserviceable bank, where the victim's letter of credit, draft, or check would be immediately converted into money without any questioning or delay. This bank was most conveniently located, immediately across the street from the 16 to 1 saloon. The Stewarts must have been aware of the gathering there of this noisy, disreputable gang of gamblers. Their unsavory character and reputation in conducting swindling foot races was a matter of common notoriety in the little village. The malodor of the "Buckfoot gang" permeated the social and business atmosphere of the community. Proof of the general notoriety of the business conducted by this gang is admissible to carry home knowledge to the defendants. This rule is aptly stated in Benoist v. Darby, 12 Mo. 206:

"Where particular knowledge of a fact is sought to be brought home to a party, evidence of the general reputation and belief of the existence of that fact among his neighbors is admissible to the jury as tending to show that he also had knowledge as well as they. It is next to impossibility in very many cases to fix a positive knowledge of a fact upon an individual, notwithstanding the interest he may have in being correctly informed, and doubtless is informed thereof, and we cannot see the injustice of permitting a party to raise a presumption of knowledge in such a case by showing that the community are informed on the subject, and hence the party interested may also have similar knowledge."

But the evidence in this case goes much further to show actual knowledge on the part of the defendants of the fact that the "Buckfoot gang" was stealing other people's money. Boatright, a hitherto impecunious man, engaged in no known avocation of profit, soon after the operations of the "gang" began became a depositor in the defendant bank of large sums of money. The accounts of himself and Ellis, who seemed to be his principal coadjutor, were placed with the bank in other names. The name of Boatright's mother, a moneyless woman, was used, as also that of Boatright's hired girl, whose signature the bank did not even take upon its depositors' book. This money was drawn out at will by Boatright and Ellis, by checks signed by them without obtaining the signatures of the nominal depositors, and without any authority thereto indicated to the bank from said women. This bank account swelled enormously. The famous gripsack, after a fake race occurred, would be carried to the bank and placed by Boatright behind the counter or desk as if it were his private place of deposit. When the victims of the conspirators went to the bank to make the deposits of Boatright's money or to draw out the money on their checks, usually some one of the gang was along or hanging close around in the bank, keeping watch; and Ellis and Landers at the same time were taking out large bundles of money which the bank officers must have known were to be used in promoting these fraudulent foot races. The testimony shows an instance where a young lady went to the bank to draw out $7,000 of money belonging to her father, which was tendered by the cashier in a large amount of gold, with the statement that he was without sufficient money in currency. She protested that the money in gold was too inconvenient. Thereat Boatright appeared at the window and passed in the noted grip to the cashier, and, without more, the cashier

took out of this grip sufficient money in currency to supply the amount necessary to fill out the order of her check.

Prior to the transaction in suit the defendant bank had brought suit in an Arkansas court to recover on some check or draft given by one of the victims for money which went to the "Buckfoot gang." To that suit the defendant made answer, explicitly alleging and charging the fraudulent character and methods of this "Buckfoot gang," by which the money was obtained through the bank. Thereupon the defendant bank took a nonsuit. On another occasion, prior to the time in question, one of the Stewarts was visited by an attorney of one of the victims of this "Buckfoot gang," who was seeking to recover back the money they had stolen from his client, and he was distinctly advised by said attorney of the character of the business conducted by "Buckfoot," and was warned of trouble to the bank by its assistance therein. On another anterior occasion, in conversation with another attorney, who visited the bank in an effort to compel it to surrender a draft, or remittance made to it on a draft, of one of the victims of the gang, the defendant James P. Stewart, in effect, stated that the bank had an arrangement with Boatright by which it would not lose anything; and in the course of the cross-examination of James P. Stewart he in substance admitted that he had knowledge of the business of the "Buckfoot gang"—that he understood that under the method of conducting the races no one on the outside ever won any money. Unless the judicial mind is to close all avenues to common sense, it cannot escape the conclusion that, when the plaintiff and others of his fellows in misfortune were drawing out their money through the defendant bank, the Stewarts knew the purposes thereof; and they must have known that it found its way into the Boatright grip, and then came back to the bank through Boatright. Time and again, when the victims of the conspirators were piloted into this bank to draw their money out to be intrusted to Boatright, they made inquiry of the bank officer touching Boatright and Ellis, and were asked respecting their reliability, and would be told that they were "all right," or could be depended upon, and that thereupon these abused and confiding men went ahead and took their money and delivered it over to Boatright. From this the inference may be drawn that the defendants were aiding and abetting. Gardner v. Preston, 2 Day (Conn.) 205, 2 Am. Dec. 91.

At the time the plaintiff was drawing out his money from the bank there was something almost pathetic in the question he put to the bank officer. It can be readily inferred that this man was almost dazed by the perplexing situation in which Boatright had brought him. He evidently had some misgivings as to intrusting such a large amount of his money with Boatright; and, while being watched and urged by one of the gang to draw his money from the bank, he anxiously inquired at the cashier's window if Boatright was all right, and, receiving an assuring answer, checked out his money. The Stewarts must have known that the reliance these strangers would place in such statement of the officers of a banking institution, in thus indorsing the character of a man who was a stranger to them, would be a persuasive inducement to them to intrust their money to the in-

tegrity of Boatright. The Stewarts knew that Boatright was not all right, for they had reason to know and believe that he was all wrong. They knew that Boatright and his associates bore the suggestive epithet of the "Buckfoot gang"; that his business was that of a gambler; that he was conducting fake foot races; and that he was, therefore, not all right, but a disreputable man. They knew that he was covering up his money in the bank under the name of a hired girl. They knew, for the evidence in this case discloses, that on a former occasion, when Boatright had been called into court to make answer under oath as to where his money was located, with a view of subjecting it to process of execution, that he had withdrawn his money from the bank, and that to enable him to carry it on his person the bank had gotten for him $31,000 in $1,000 bills; and Stewart in his cross-examination in this case undertakes to excuse himself for his assistance in this transaction by saying that he did not inquire into his purpose. With all this knowledge of the character and methods of that man, it assured the plaintiff that his $5,000, being drawn from the bank, could be intrusted to this "Buckfoot." All of which leaves the impression indelibly fixed upon my mind that the defendants were in the full confidence of the "Buckfoot gang," and were consciously aiding and abetting them in their nefarious schemes. There is evidence in this record tending to show that the method pursued by the defendant bank in sending on the checks drawn by the victims of this "gang" for collection on other banks was out of the ordinary course of collection by banks, evidencing that, in the mind of the officers of the bank, payment thereon by the drawer might be stopped as soon as he discovered the fraud practiced upon him. I attach, however, little importance to this evidence, as there is abundance of other facts and circumstances in this record which satisfies the mind of the court of the culpability of the defendants.

### Objections to Testimony.

As this case was submitted to the court on the record of evidence taken on the trial in the state circuit court of one Hobbs against the defendants, growing out of a similar transaction, it is somewhat difficult to determine exactly what objections made by the defendants to the admissibility of testimony it is intended by counsel this court should rule upon. The objections, in their essentiality, may be grouped under the following heads: First, evidence as to the acts, conduct, and statements of the members of the alleged combination, separately made in advance of what the defendants' counsel contends was not sufficient proof of the conspiracy; second, evidence showing the other acts and transactions of the "Buckfoot gang," in which other parties are alleged to have been cheated out of their money by said fake races prior and subsequent to the transaction on trial. As a general proposition of law it may be conceded that, in an action founded on conspiracy, the existence of the conspiracy should be first established, prima facie, before the acts and statements of the alleged members of the conspiracy, not made in the presence of all, are admitted in evidence. But, as it is not to be expected that the conspirators came to their conventions in the open, and may have

reached an understanding among themselves without any formality of expressed agreement, it would be quite impossible to establish the existence of the conspiracy in many cases otherwise than by progressive steps in detail, by tracing the separate footsteps of each alleged party to see if they do not all converge to a common center of purpose. It is by collecting together the apparently scattered parts that the composite structure is formed. The order in which the evidence shall be admitted must necessarily, at times, rest in the sound discretion of the trial judge. When the collected evidence in this case is considered as a whole, it shows beyond any reasonable doubt that the persons named in the petition as members of the so-called "Buckfoot gang" were acting in concert with and under the mastery of Boatright as its head center. Although some of them may have come into the conspiracy from time to time after its inception, yet, as they were found co-operating with and aiding the object of the conspirators, they became responsible, at least, for every act and wrong subsequently done in furtherance of the purposes of the association.

It is equally well settled that in a civil action for redress against wrongs of alleged conspirators, for the purpose of establishing the existence of the conspiracy and demonstrating the character of the particular wrong complained of, the conduct, acts, and declarations of the conspirators, in pari materia, from the inception of their operations, may be inquired into and unfolded. Of course, such evidence must pertain and be limited to acts of a like character in furtherance of the common purpose, continuing up to the time of the particular matter on trial. State v. Myers, 82 Mo. 558, 52 Am. Rep. 389; State v. Beaucleigh, 92 Mo. 490, 4 S. W. 666; Davis v. Vories, 141 Mo., loc. cit. 241, 242, 42 S. W. 707; O'Hara v. U. S. (C. C. A.) 129 Fed. 552. "The mental conditions of knowledge, intent, and plan (or design) may often be evidenced by conduct of the person, exhibited at other times, but leading by one process of thought or another to an inference that he has knowledge, intent, or plan with reference to the act in question." 1 Greenleaf on Evidence (16th Ed.) par. 14q. See Wood v. United States, 16 Pet. 342–360, 10 L. Ed. 987. The rule is aptly expressed in United States v. Wilson (D. C.) 60 Fed. 898. After alluding to the fact that a criminal agreement between certain parties was established, the court said:

"The assent of the other defendants may be established as an inference by the jury from the other facts proved. Any joint action upon a material point, or a collection of independent but co-operating acts, by persons closely associated with each other, is sufficient to enable the jury to infer concurrence of sentiment. Archer v. State, 106 Ind. 426, 7 N. E. 225. Without the proof of the original agreement, it was competent to prove the acts of the different defendants, and thus prove the conspiracy between them. Spies v. People, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320. The evidence of joint action between the defendants covers a great many transactions, and extends over several months of time. It is not only sufficient to authorize an inference of guilt, but it is of a character, if believed, to make any other inference impossible."

There is also good reason and authority for the proposition that where the question involved is as to the fraudulent character of the

transaction and the existence of a conspiracy, as also the guilty knowledge of the alleged participants, evidence of subsequent like acts and transactions, of a similar character, closely allied in point of time, before the end of the conspiracy, may be admitted. Cary v. Hotailing, 1 Hill, 311, 316, 37 Am. Dec. 323.

In Erfort v. Consalus, 47 Mo. 212, 213, where the admissibility of evidence of acts and conduct of the alleged fraudulent conspirators was in question, the court said:

"It was also proper to show what preceded and followed the transaction, the relations of the parties prior and subsequent, and all the facts and circumstances surrounding the principal event."

In Lane v. Kingsberry, 11 Mo. 410, Judge Scott said:

"The transactions of an individual so frequently running into each other, in order to ascertain his conduct, his transactions about the time of his making a conveyance, sought to be avoided, must be inquired into; nor should they be rejected in evidence, although they may have occurred after a fraudulent conveyance, if they serve to throw light upon, or to explain, his previous conduct. In the investigation of questions of this kind, the courts should lend an unwilling ear to the objection of irrelevancy merely. If the evidence is merely irrelevant, it cannot affect the rights of the objector. The delay in hearing such evidence is never as great as that caused by arguing the question of its admissibility. It is always best for the courts to err on the safe side."

The transactions between the witness John R. Black, of Griswold, Iowa, and the "Buckfoot gang" and the defendants, which occurred near the middle of November, 1901, for instance, is so nearly allied in point of time and so similar in its character in many respects to the case on trial that its competency should be unquestioned. It was but a continuation of the business of the "Buckfoot gang" and the bank, which illustrated their method of operation, and throws a calcium light on the knowledge and assisting co-operation of the defendants in furthering the fraudulent scheme of the "gang" at the time of the transaction at bar. Beyond this transaction the court excludes the evidence as to other like transactions. Nor does the court, by admitting the evidence touching the Black transaction, wish to be understood as deeming it essential to the conclusion reached by the court as to the culpability of the defendants, as there is ample evidence to satisfy the court on this issue exclusive of the Black incident.

Can the plaintiff recover on the foregoing facts? If, as urged, the money sued for was in fact put up by plaintiff as a wager on a foot race, real or feigned, the evidence shows that not only when the plaintiff intrusted his money with Boatright as stakeholder he distinctly stated to him that he was not wagering it on any race, but before the simulated race occurred, time and again, he demanded of Boatright its return, which was refused. The law ever accords to the party about to commit a wrongful act—delictum—his locus poenitentiæ. The refusal to return the money on demand gave the plaintiff a right of action to recover it. Bernard v. Taylor (Or.) 31 Pac. 968, 18 L. R. A. 859, 37 Am. St. Rep. 693; Wood v. Duncan, 9 Port. 227; Shackleford v. Ward, 3 Ala. 37, 36 Am. Dec. 435; Hardy v. Hunt, 11 Cal. 343, 70 Am. Dec. 787; Humphreys v. Magee, 13 Mo. 435; Adams

Express Company v. Reno, 48 Mo. 268. The stakeholder cannot set up the illegality of the contract as a defense to the action to recover the deposit. Alford v. Burke, 21 Ga. 46, 68 Am. Dec. 449. See, also, Vischer v. Yates, 11 Johns. 23; Barrett v. Neill, Wright (Ohio) 472; Tarleton v. Baker, 18 Vt. 9, 44 Am. Dec. 358.

It is insisted, however, on behalf of defendants, that the plaintiff, by consenting to aid Boatright in what he understood to be a fixed race, by betting Boatright's money as his own, became particeps criminis, or in pari delicto with the conspirators, and, therefore, has no standing in court for relief. In the consideration of this aspect of the case it is altogether important to keep in mind the precise status of this case, for it makes the situation of the parties quite sui generis. There never was any scheme devised or proposed on the part of Boatright and his confederates to win any money from a third party on a foot race otherwise than by inducing third parties, strangers to the conspiracy, to intrust their money to Boatright. There never was any of Boatright's money or any of his confederates' in fact wagered against any money put up by any opposing racer, other than that of the common fund of the conspirators. All the parties to the confederation understood and knew that all the money put up on behalf of Boatright and those apparently betting against him belonged to the common fund, under the control and in the possession of Boatright. There was no money wagered by Ellis and his abettors against Boatright's money. The money put up by them was never in fact a wager. The very definition of a wager is:

"A contract by which two or more parties agree that a certain sum of money or other thing shall be paid or delivered to one of them on the happening of an uncertain event." Black's Law Dictionary.

"A wager is an agreement between parties differing as to an uncertain fact or forecast of a future event," etc. Bishop on Contracts, par. 530.

There was in this case no uncertain event to constitute a wager as between the Boatright gang. There was nothing uncertain about it. In fact, they were not wagering anything at all. The sole scheme in this case was to obtain and steal the money of the plaintiff. There was no third party in fact to be cheated and swindled by any act or thing done by the plaintiff. How, then, can it be maintained that the plaintiff, whose money both sides to the simulated wager had conspired and agreed to steal, was particeps criminis, or in pari delicto, with the defendants in promoting a scheme to defraud some one? There was no one to be defrauded but the plaintiff. There was no innocent third party to be duped and lured into hazarding his money on a fake foot race, to be defrauded by reliance upon the fact that the plaintiff was betting his money with them. There was no conspiracy to defraud anybody but the plaintiff himself. A man cannot swindle and steal from himself. And it would seem to be a solecism in terms, an impossibility in law, to say that a man was participating with others in a scheme to defraud and steal from himself. The sole conspiracy among the "Buckfoot gang" and their coadjutors was the compact to obtain, by deceit and falsehood, the money of the plaintiff, by inducing him to believe that the conspirators were actually wagering the money of the one against the other on a foot race, and to

induce the plaintiff and other strangers to this secret compact to believe that they were in fact wagering their money, which was to be won by a race fixed in the interest of Boatright; and therefore the only compact, as a conspiracy, in which it can be claimed that the plaintiff became particeps criminis, or an aider or abettor, was an agreement to obtain and steal his own money. It seems to me that it would be a reproach to the law if the parties who thus inveigle and deceive a third party, by which they obtain and steal his money, can go unwhipped of justice and keep and enjoy their ill-gotten gains, by taking shelter under maxims of the law that were intended to prevent fraud and the perversion of justice.

The trend of modern jurisprudence is to get away from the technical or literal application of ancient maxims of the law intended to prevent fraud by refusing audience to a party who in his complaint discloses that he himself is tainted with moral turpitude, when its application in the particular case would prove but a cover and shelter for the scoundrel who by falsehood and deceit inveigled the complainant to trust him with his money. In other words, where the ends of public policy will rather be promoted by giving than refusing relief, courts prefer the former. In short, although the complainant may in some degree be in delicto, yet, unless he is also in pari delicto with the defendant, it does not, and should not, follow that the doors of the temple of justice should be closed against him. Pomeroy, in his work on Equity (volume 2, § 942), expresses this distinction very aptly and clearly:

"Lastly, when the contract is illegal, so that both parties are to some extent involved in the illegality—in some degree affected with the unlawful taint, but are not in pari delicto; that is, both have not, with the same knowledge, willingness, and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworthy—a court of equity may, in furtherance of justice and a sound public policy, aid the one who is comparatively the more innocent, and may grant him full affirmative relief, by canceling an executory contract, by setting aside an executed contract, conveyance, or transfer, by recovering back money paid or property delivered, as the circumstances of the case shall require, and sometimes even by sustaining a suit brought to enforce a contract itself, or, if this be impossible, by permitting him to recover the amount justly due by means of an appropriate action not directly based upon the contract. Such an inequality of condition exists, so that relief may be given to the more innocent party, in two distinct classes of cases: (1) It exists where the contract is intrinsically illegal, and is of such a nature that the undertakings and stipulations of each, if considered by themselves alone, would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction, and affecting the relations of the two parties, which render one of them comparatively free from fault. Such circumstances are imposition, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement, or of procuring him to execute and perform it after it had been voluntarily entered into. (2) The condition also exists where, in the absence of any incidental and collateral circumstances, the contract is illegal, but is intrinsically unequal, is of such a nature that one party is necessarily innocent as compared with the other, and the stipulations, undertakings, and position of one are essentially less illegal and blameworthy than those of the other."

With characteristic discrimination and sense of justice, Judge Napton, in Gowan's Administrator v. Gowan, 30 Mo. 472, held that where a debtor deposits property in the hands of another, with a view fraud-

ulently to protect it from his creditors, such depositary is but a bailee, and cannot avail himself of such fraudulent intent to defeat an action brought against him for restitution. After adverting to the general doctrine that courts of equity and law will not afford relief to a party who admits his own fraud or turpitude, he said:

"But the plaintiff here asks no aid of a court of law or equity to set aside anything that has been done, either in the shape of a conveyance or otherwise. He simply asks that the bailment be enforced; that, as he put the property in the defendant's hands subject to his order, he shall now have it again when demanded."

He further said:

"It may be questioned whether the determination of courts to give no assistance in the case of fraudulent conveyances, as between the parties, has been promotive of the ends of justice and is founded upon sound morality. It is seldom that both parties are equally to blame in a transaction tinctured with fraud in each, and, if they are, the doctrine seems to encourage a double fraud on one side to punish the single fraud on the other. But we will not be understood as questioning the propriety of the general rule. We merely make the observation to show that it has been carried far enough. It ought not to be extended to cases not properly within its sphere. We might as well be asked to go further still and allow a defendant to defend himself against a just claim by the general allegation that the plaintiff was a dishonest person or had committed some crime."

In Adams Express Company v. Reno, 48 Mo. 264, one John Reno had been sent from Davies county, Mo., to the state penitentiary. His relative, Clinton Reno, being advised that for the sum of $5,000 the judges of the county court and Ballinger, the sheriff of the county from which John Reno had been sent to the penitentiary, could bring influence to bear on the Governor to obtain a pardon for John, raised $4,000 for this purpose and sent his sister to Jefferson City. Failing to meet Ballinger there, as expected, she was persuaded by the warden of the penitentiary to leave the money with him, to be handed to Ballinger when he appeared there. Ballinger not appearing, however, the warden deposited the money in bank. In an action by attachment by the Adams Express Company against John Reno, this money was garnished. Clinton Reno appeared and interpleaded in this action, claiming the fund. There, as here, it was insisted that, as the money was intended to be used for an illegal, corrupt purpose, the law would not assist Clinton Reno in recovering it. The Supreme Court rejected this contention. The court said:

"Where parties have been guilty of turpitude in entering into illegal agreements, or have performed acts which are stigmatized as against public policy, the courts of the country furnish them no redress. But if propositions have merely been made contemplating such purposes, but nothing has been done to finally accomplish or consummate them, they stand in a very different attitude. The moral stain has not attached, and the guilt has not been carried out. The doctrine applies solely to executed contracts, but I have never seen any case which would warrant its application to contracts which are executory."

The reasoning of the court further on in the opinion is that, although the money was placed by the plaintiff in the warden's hands for a grossly corrupt purpose—of influencing the Governor to grant a pardon—and although the conception of the plaintiff was tainted

with turpitude, yet, as the money was not in fact used to advance the forbidden purpose, and no third person's act was influenced or affected thereby, the doctrine of moral turpitude had no just application, and therefore the warden and his privy, the bank, held the money as mere bailee, and plaintiff's title therein had never passed.

The plaintiff's attitude in the case at bar is stronger. He did not intend to bribe or corrupt anybody. He was induced by the "Buckfoot gang" to place his money in Boatright's hands under the false assurances that it was necessary to be used to make a showing of the stake money, and then to be immediately returned to the plaintiff. It was never intended by Boatright to use it for the purpose which he represented. It was never in fact so used. No count was thereafter made of the so-called stake money. Nobody was misled or wronged by the plaintiff placing the money in Boatright's hands. Boatright held the money as special bailee for the plaintiff on a condition which he himself had falsely concocted, and was never expected or intended to transpire. When he refused on demand to return it to the rightful owner, he was guilty of a conversion and theft. It does not, therefore, lie in the mouth of his confederates in the wrong to talk about turpitude and the doctrine of contra mores. Suppose, after Reno had so placed his money, through his sister, with the warden of the penitentiary, he had become suspicious of a plot by the warden to appropriate the money to his own use, and had, eo instante, made demand on the warden for its return, and the warden had refused; would the warden, when sued for conversion, be heard to say there was an unexecuted purpose on the part of the plaintiff in placing the money with him to cheat or corrupt somebody, and therefore he had a right to keep his money? The Supreme Court of this state answers no.

In Poston v. Balch, 69 Mo. 115, Poston and his wife had a domestic disagreement. The wife instructed her attorney to institute divorce proceedings. But in the meantime the husband and wife had agreed upon a separation and division of the property, which she accepted in lieu of alimony and other claims against his estate. Her attorney, not being aware of this settlement, brought the suit, and inserted in the petition a claim for alimony. The husband, in ignorance of the mistake by which this claim was advanced, became alarmed, when he was visited by the defendant, who pretended to be his friend. He disclosed to the defendant his domestic trouble, and requested him to intercede to have his wife withdraw her claim for alimony. The defendant, on the contrary, urged her to insist upon this claim, which she declined, and declared her purpose to stand by the settlement. Notwithstanding this, the defendant reported to the plaintiff that she would insist upon the demand for alimony; and on his suggestion, in order to defeat her claim, the plaintiff, on a nominal or inconsiderable consideration, transferred all his property to the defendant. On discovering the fraud practiced upon him by the defendant, he brought suit to set aside the transfer and subject certain real estate, obtained by the defendant in exchange for the plaintiff's property, to a lien for the value of it. It was held that the parties were not in pari delicto, and the relief was granted. Judge Napton, in the course of his opinion, discussed the application of the doctrine of in pari delic-

to, referring to the discussion of Judge Story, to the effect that courts did not affect to sit in judgment upon cases as custodes morum, enforcing a strict rule of morality. "But they do sit to enforce what has not been unaptly called a 'technical morality.' If confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition." He further placed his ruling upon the proposition that both parties were not in pari delicto, and then said:

"Shall the defendant, who was principal in this gross fraud, be allowed to avail himself of the maxim, 'In pari delicto potior est conditio defendendis,' and thus retain the profits of his deception? * * * We base our conclusion to set aside the transfer solely on the ground that there was a breach of confidence in the case, and, although the relations of the parties were not of that character which renders transactions between them on inadequate considerations presumptively void, so as to require satisfactory proof to establish their fairness, etc., yet they were such as required from the party in whom a special trust was reposed, the utmost degree of good faith. It must appear that the contract was fair, just, and equitable, and not procured by undue influence and false representations. Here the transfer was made at the suggestion of the defendant, following a false statement of his interview with plaintiff's wife. The parties were not in pari delicto. It is probable that the sole ground upon which the bill was dismissed in the circuit court was the participation of both parties in the intention of defeating the supposed claim of Mrs. Poston for alimony. The defendant was perfectly aware that no such claim had any existence. The plaintiff assumed that the report of the defendant, who was especially intrusted by him, was true, and under this hypothesis accepted the offer of defendant to place his property beyond the reach of this claim."

It is difficult to differentiate that case, in principle, from the case at bar. There was in the mind of plaintiff, when he placed his money in Boatright's hands, it may be conceded, the intention that it might be used to deceive third parties. So Poston put his property in the hands of Balch with the intention in his mind at the time to defeat his wife's claim for alimony. Boatright and his confederates were perfectly aware when they obtained the plaintiff's money that the ground upon which they obtained it had no existence in fact, was entirely fictitious, just as Balch was perfectly aware when he obtained Poston's property that no claim for alimony in fact existed. The plaintiff here assumed when he parted with his money on the statement and representation of Boatright, "who was especially intrusted by him," that such statements were true, and under that assumption was induced to intrust his money to him, just as Poston was induced to intrust his property to Balch.

Again, in Bell v. Campbell et al., 123 Mo. 1, 25 S. W. 359, 45 Am. St. Rep. 505, the complainant, an aged woman, was induced by her son-in-law and the sureties on his official bond to execute a mortgage on her land to indemnify them on the defalcation by her son-in-law to escape punishment for a crime, when in fact this was a false pretense. It was held that, notwithstanding she executed the mortgage for the purpose of protecting her son-in-law from criminal prosecution, it did not preclude her from relief on the ground that she was in pari delicto, "as she cannot be regarded as equally culpable with the defendants." After adverting to the rule that courts will relieve parties against undue advantages "under circumstances which mislead, confuse, or disturb the unjust result of his judgment, and thus

expose him to be the victim of the artful, the importunate, and the cunning," the court said:

"It is urged that, if the deed of trust and notes executed by the plaintiff had been given through fear of Carter's criminal prosecution and in order to prevent the same, then she stands in pari delicto with the other parties to the transaction, and therefore there could have no relief against the enforcement of those writings obligatory. There are two answers to this contention: First. Granting that plaintiff did enter into the contract with that purpose in view, she will not be debarred from pursuing her remedy, because she cannot in any event be regarded as equally culpable with the adversary parties. When this is the case, a court of equity will interfere and go to the relief of the less guilty party, whose transgression has been brought about by the imposition, undue influence, etc., of the party on whom the burden of the original blameworthiness principally rests."

This is unquestionably the Missouri doctrine on this question, and it is in accord with current authority. Judge Adams, of the Eastern District of this jurisdiction, in the recent case of In re E. J. Arnold & Co., not yet published, recognized and applied this rule to the instance of the right to recover back money placed with a swindling concern for gambling purposes on horse races, with many citations in support thereof. See, also, Anderson v. Meredith, 82 Ky. 564; Johnson v. Cooper, 10 Tenn. 523, 24 Am. Dec. 502; Harrington v. Grant, 54 Vt. 236; O'Connor v. Ward, 60 Miss. 1025; Rucker v. Wynne, 39 Tenn. 618; Webb v. Fulchire, 40 Am. Dec. 419.

In Bernard v. Taylor (Or.) supra, this rule was applied to an instance quite germane to the one at bar, as it arose out of a "fixed" or "job" race. It was held that the party thus cozened out of his money could recover.

The case of Catts v. Phalen et al., 2 How. (U. S.) 376, 11 L. Ed. 306, sustains the position taken in the foregoing discussion. Phalen and Morris were running a lottery in violation of law. Catts was employed in drawing the tickets for them. He arranged with one Hill to purchase a certain ticket with money furnished by himself, and he so manipulated the drawing as to make the ticket draw a prize of $15,000, upon which was paid by Phalen and Morris to Hill, for the benefit of Catts, $12,500. On suit to recover, the defense interposed the illegality of the transaction. The court, after animadverting upon the deliberately concocted, wicked fraud, said:

"The consequence is that he has not and cannot have any better standing in court than if he had never owned a ticket in the lottery, or it had never been drawn. So far as he is concerned, the law annuls the pretended drawing of the prize he claimed, and in point of law he did not draw the lottery. His fraud avoids not only his acts, but places him in the same position as if there had been no drawing in fact, and he had claimed and received the money of the plaintiffs by means of any other false pretense, and he is estopped from avowing that the lottery was in fact drawn. * * * The contract which the law raises between them is not founded on the drawing of the lottery, but on the obligation to refund the money which has been received by falsehood and fraud, by the assertion of a drawing which never took place."

To the same effect are the cases of Phalen v. Clark et al., 19 Conn. 421, 50 Am. Dec. 253; Timmerman v. Bidwell, 62 Mich. 205, 28 N. W. 866; Smith v. Blachley, 188 Pa. 550, 41 Atl. 619, 68 Am. St. Rep. 887, 888.

In Kitchen v. Greenabaum, 61 Mo. 110, much relied upon by defendants' counsel, Judge Sherwood, in adverting to the foregoing rule, observed that it "must not be understood as applying to those involving moral turpitude, for there no inquiry will be made into the relative guilt of the contending parties, but to those where the offense is merely malum prohibitum, and is not in its nature essentially or necessarily immoral, nor violative of any general principle of public policy." This assertion is mere obiter dictum. The contract ruled on was prohibited by the Constitution of the state, and therefore, in contravention of the declared public policy of the state. In the breadth of the statement it is in direct conflict with the later opinion of Judge Sherwood in the case of Bell v. Campbell, supra, and it has been directly departed from by the Supreme Court of the state in the following cases: Sprague v. Rooney, 104 Mo. 360, 16 S. W. 505; Roselle v. Farmers' Bank, 141 Mo. 44, 39 S. W. 274, 64 Am. St. Rep. 501; Haggerty v. Ice Mfg. & Storage Company, 143 Mo. 247, 44 S. W. 1114, 40 L. R. A. 151, 65 Am. St. Rep. 647. And in Green v. Corrigan, 87 Mo. 359, 370, where it was distinctly asserted that:

"Where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt. The maxim, 'In pari delicto potior,' etc., is not of universal prevalence. Another exception arises where the parties to the transaction, although concurring in the illegal act, are regarded as not equally guilty, in consequence of fraud, oppression, imposition, or hardship practiced by one party upon the other, thereby attaining an unconscionable advantage."

The case of Knight v. Linzey, 80 Mich. 396, 45 N. W. 337, 8 L. R. A. 476, which grew out of what is known as the "Bohemian oats" swindle, is by no means apposite to the case at bar. A radical distinction lies in the palpable fact, as disclosed on page 402, 80 Mich., page 339, 45 N. W., 8 L. R. A. 476, that there was in that case some innocent third party to be defrauded by the scheme in which the claimant entered, whereas, as already demonstrated, there was no innocent third party in fact to be defrauded by the plaintiff's consent to do what he did for Boatright. It was purely a scheme by the Boatright gang, feigning bets among themselves, to steal the plaintiff's money.

The same is true of the case of Shipley v. Reasoner, 80 Iowa, 548, 45 N. W. 1077, which also grew out of a contract respecting the sale of Bohemian oats.

In Abbe et al. v. Marr et al., 14 Cal. 210, the petition disclosed that the plaintiffs, after they had been swindled in a horse race, through a combination of the parties thereto, deliberately went into a scheme with the defendants, not only to get even, but to win more money than they had lost in the first fraudulent race. Again losing, they sued to recover back the wager. Without further discussion, that case is clearly distinguishable from the one at bar. There the plaintiffs deliberately entered into a conspiracy to steal the money of a third party. With their own consent they put up their property as a wager, ran the race out, and after it was lost brought suit, and in the petition averred their own turpitude, whereas, here the plaintiff never consented to put up his $5,000 on the foot race, and demanded it back

before the simulated race was run. His going out to the race track and what he did there were practically under coercion, reasserting to Boatright before the conclusion of the race that it was a swindle, and again demanding the return of his money. It was known to the conspirators that the plaintiff's money was not put in Boatright's hands as a wager; that it was intrusted to him in a matter wholly collateral. As such it was of the nature of a bailment. The law accorded to him his locus pœnitentiæ, and, when he demanded back his money prior to the proposed race, the law should respect his withdrawal.

In view of the relation the defendant bank and its officers sustained to the public, conducting a banking institution under a charter from the state, where integrity of conduct of such an institution and its officers is expected to be displayed, when its managing officers lent the use of the bank to such a disreputable combination as the "Buckfoot gang," and induced the plaintiff, its confiding patron, to draw from the bank his money and intrust it to the foul hands of the chief of the "gang," with reason to know that it would, in effect, be stolen by him, and he drew out his money on the indorsement of the bank's officer of Boatright's trustworthiness, the court will best subserve the interest of a sound public policy by holding that the bank and its officers shall make good that assurance  For there is good sense in the sentiment expressed by Lord Thurlow, in Nevill v. Wilkinson, 18 Ves. 383, to the effect that, if courts of justice mean to prevent the perpetration of criminal wrongs, it must be, not by allowing a man who got possession to remain in possession, but by putting the parties back to the state in which they were before the delict or crime.

The issues are found for the plaintiff as to the $5,000 drawn by the plaintiff from the defendant bank, with interest thereon from the 7th day of September, 1901, when the plaintiff made demand of Boatright for the return of the money.

Judgment accordingly.