## LOCKMAN *v.* COBB.

### Opinion delivered December 16, 1905.

FRAUDULENT WAGER—RECOVERY OF MONEY BET.—One who was fraudulently induced to part with his money under the belief that he was betting upon a foot race, when in fact the result of the pretended race was determined before it was made, is entitled to recover the money so wagered.

Appeal from Garland Circuit Court; ALEXANDER M. DUFFIE, Judge; affirmed.

*Wood & Henderson,* for appellants.

1. It was error to take the case from the jury and direct a verdict for plaintiff. It was for the jury alone to pass upon the sufficiency of the evidence to establish fraud, and the existence of a conspiracy. 23 Ark. 115; 37 Ark. 580; 45 Ark. 165; 45 Ark. 492; 58 Ark. 108; 19 Ark. 648; 39 Ark. 413; 43 L. R. A. 505.

2. If plaintiff engaged in the undertaking with intent to aid and encourage an unlawful and immoral transaction, he is *in pari delicto* with defendants, and cannot recover. 47 Ark. 383; 48 Ark. 487; 53 Ark. 147; 63 Ark. 318; 25 Ark. 209; 25 Ark. 350; 67 Ark. 480; 56 Ark. 300; 139 U. S. 67; 103 U. S. 49; 12 Wall. 349; 131 U. S. 336; 56 L. R. A. 606; 55 L. R. A. 93; 37 Am. St. Rep. 693; 2 Beach on Cont. § § 1498, 1499, 1553, 1556 and note 4, 1561; 16 S. W. 505; 61 Mo. 110; 14 Cal. 210.

*Geo. G. Latta* and *Greaves & Martin,* for appellee.

1. If it be held that the money was lost upon a wager at a footrace, plaintiff had a right to recover under the statute as for money lost upon a gaming contract. Kirby's Digest, § 3687.

2. Where the facts are shown by competent evidence, which is not contradicted, only a question of law is presented, and the trial court has power to direct a verdict. 5 Ark. 649; *Ib.* 74; 7 Ark. 241; 8 Ark. 491; 14 Ark. 706; 35 Ark. 155; 39 Ark. 499; 57 Ark. 461; 61 Ark. 454; 62 Ark. 68; 51 Ind. 203; 75 Ill. 181; 52 Ark. 347; 51 Ark. 140.

3. Even if plaintiff were *in pari delicto* with defendants, he is, under the proof, within the well-defined exception to the rule; but where there are circumstances of fraud, or overreaching, and where the recovery would be in aid of public policy, the law allows recovery, though the plaintiff is himself guilty of unlawful acts. 1 Pom. Eq. Jur. (2 Ed.) § § 402, 403; 18 L. R. A. 859; 16 Am. Dec. 556; 87 Mo. 370; 123 Mo. 1; 69 Mo. 115, 143 Mass. 578; 54 Vt. 554; 22 Wis. 26; 72 Mass. 505; 3 Allen (Mass.), 176. Where there is imposition, undue influence, taking advantage of necessity or weakness, the party thus placed at disadvantage, though participating in the fraud, may be relieved against the wrongdoer. 82 Ky. 564; 85 Ky. 160; 32 Mich. 146:

104 Mass. 59; 58 Me. 199; 10 Mass. 63; 35 N. H. 271; 119 Mass. 66; 60 Miss. 1025; 10 Tenn. 524; 39 Tenn. 618; 32 Ark. 762. Money won by cheating at any kind of game, or obtained by means of jugglery; trick, device, scheme or fraud, and paid by the loser, may be recovered by the loser.   67 N. Y. 322; 40 Am. Dec. 419; 4 Jones (N. C.), 524; 1 Hun, 576; 133 Fed. Rep. 789; 68 Am. St. Rep. 887; 3 Hun, 237; 67 N. Y. 322; 40 Am. Dec. 419.

BATTLE, J.   This action was brought by J. W. Cobb against R. H. Williams, C. A. Ryan, G. R. Thompson, and I. E. Johnson, to recover money which he alleged was obtained by them through fraudulent acts and representations.   The defendants answered, and denied the material allegations of plaintiff's complaint, and alleged that plaintiff "had parted with his money on a bet or wager upon an unlawful game; and that in betting his money he did so with the purpose and intent of wrongfully and fraudulently winning the money of the person against whom he was betting, and that if there was any fraud or conspiracy in the transaction he was a participant therein."

The issues were tried by a jury, and witnesses in behalf of plaintiff testified substantially as follows:

Cobb, the plaintiff, testified:   "That he is a resident of Corrigan, Texas, proprietor of a saloon, livery stable and feed store, and had been acquainted with the defendant, I. E. Johnson, seven or eight years.   The defendant, Johnson, as Cobb supposed, was a painter by occupation, but for several years had been engaged in taking orders for suits of clothes and selling men's furnishings.

"It was in August, 1902, that Johnson approached witness, and opened to him the foot race proposition, claiming that he had a life-long acquaintance, whom he had befriended when they were schoolmates, and who promised Johnson that, if the future afforded an opportunity, he would do him a kindness in return. Johnson then related to Cobb that his friend, Harry Price, had been running races for a club of Colorado millionaires who were engaged in athletics merely for the sport, and that he had won considerable money for the club.   But he also confided to him that he had been matched with a Montana man, who Price knew could beat him, and, inasmuch as the club was to lose its money in any event, the manager of the club had proposed to furnish

money for some outsider to bet against the club's man, namely $6,000, which was the purse for which the race was to be run. It was proposed that Cobb should go to Colorado Springs, and handle the money. He at first refused, but was finally persuaded to go. The reason given for Cobb's services being in demand was that he was known to be a man of means, and his wagering such large sums would excite no comment, whereas persons of limited means would be subject to inquiries.

"Cobb was then made acquainted with the runner, Harry Price, whose report of the proposed race dovetailed with the statements of Johnson. Price represented that he knew he would be defeated by the Montana man, and that he and the manager of the club might as well have the money as a stranger. It was made plain to Cobb that he was not to hazard any money of his own, but only such sums as were furnished him by Thompson, manager of the club. Cobb protested that he knew nothing about the matter, but was willing to go out there with his friend, Johnson.

"The runner, Harry Price, then left, claiming he was going back to Colorado Springs, and also stating that he had given the millionaire club, as an excuse for leaving, that he was visiting a sick sister in Missouri, under cover of which excuse he came to Texas to see Johnson, and have a talk with him.

"Cobb armed himself with a letter of introduction from his bankers, and, thus equipped, he and Johnson started for Colorado Springs. At Fort Worth Ben Ansel, another runner, who had started to meet Harry Price, joined them, and together they went to Colorado Springs. There they met Harry Price, and were introduced to G. R. Thompson, manager of the club. The supposed manager of the club corroborated what had previously been stated to Cobb by Johnson and Price, and also stated that Price had volunteered to secure the services of Johnson, an old friend and schoolmate, to come out and bet the money. Said the club members were very wealthy, and what they would lose would make no difference, and that he had explained to them that Harry would be beaten in the next race, but they were determined to bet on him in any event.

"Cobb states repeatedly in his testimony that it was a new sort of business to him, that he knew nothing about racing or betting.

The next morning Cobb was introduced to several of the supposed club members, including Ryan and Williams. Thompson proposed before this meeting, however, that the race be arranged for $5,000 or $10,000 stakes, and gave Cobb $2,500 to put up as a forfeit. Some of the club members arriving about this time, Thompson introduced the witness, and said to the clubmen that these were men from Texas, coming to match a race. He also explained that part of the members were absent. Inquiry was made as to how much of a race was wanted, and it was proposed to make it for $10,000. Thompson agreed, and $2,500 a side was put up as a forfeit. Drinks were then had, and Thompson handed Ben Ansel $5,000, which Ansel turned over to witness with directions to bet it, which the witness proceeded to do. Adjournments were had from time to time, at which intervals money was handed to the witness to bet. It was then suggested that most of the club members were up at Ogden, Utah, on some mining business, and they seemed to feel it was necessary to see a man named Washburn (afterwards identified by witness as the defendant, R. H. Williams), and after some parley it was agreed that the party should go to Ogden, Ryan agreeing to pay the expenses. To Ogden they went, and for the first time it was suggested to the appellee that he should make a showing of some money. It was stated to him that he would not need it, but that it was necessary to make a showing with.

"After persuasion of the appellants and their associates, the appellee went to the bank at Salt Lake, and drew for $10,000. Within a day or two the bank notified appellee that the money was there for him, and then appellee went up to Ogden, and met the man Washburn, who proved to be really the defendant R. H. Williams. A number of other members of the club were also at Ogden. More money was given to the appellee, and he was introduced to a man named Burns, one called "The Honey Grove Kid," and others. Cobb bet the money given him, and presently some confusion was caused by one of the clubmen claiming that he had paid in a $500 bill to the stakeholder for a fifty, and asked that the money in the purse be counted to verify his statement. Thompson, the stakeholder, demurred to this, insisting that the purse was all right, but giving Cobb to understand that he did not dare count the purse because the money in it had been bet

over and over again, and a count would show a shortage. (This part of the acting occurred at about the same place in every transaction.) Some confusion was caused by this demand that the money be counted, and Johnson suggested to Cobb that they had better get away, and as they left Cobb remarked to Johnson, 'Them fellows are going to have him count the money, all right, and I don't blame them; I would, too,' and that the affair would be all off. But presently Ben Ansel joined them, and reported they had agreed to put the purse in the bank, and count it after everything was decided. The next morning, Thompson, the stakeholder, came to Cobb's room, and seemed to be in great distress, claiming they were short $7,500 of the purse money, and wanting to know what to do about it. He asked Johnson if he had any money, and Johnson answered that he had bet every cent he had. Thompson then turned to Cobb, who declared that he would not put up any money, and for them to say nothing to him about it. Thompson then said that, if that was the case, he might as well skip for Missouri, as, if the fellows counted the money, he was gone, and then Johnson begged the witness to furnish the money, which presently he did.

"The race was then run, and Ben Ansel, who was supposed to win for Cobb, Price and Thompson, the manager, while safely ahead in the race, fell down. (This always occurred in all of their races.) Thompson then said to Johnson, 'For God's sake, go and get them to have a new race,' and appealed to Cobb to help Johnson get a new race. Presently Ansel got up, not having been killed by his fall. Then the witness remarked that the race was not fair, this man having fallen down. A new race was then spoken of, and it was finally agreed to put up $20,000 more in addition to the $80,000 already supposed to be up, making a total purse of $100,000, for which they would run a new race twenty or thirty days hence, when Ansel should recover, the winner to take the whole purse; also that the runners were to run clear through, and not fall down, or that, if one did fall down, the race was to be off. Johnson and Thompson, the manager, agreed to raise the $20,000 for the new race. On the way back to the hotel Thompson related to witness that he had a friend in Missouri, whom he could get the money from, and Johnson also said that he had a sister in Missouri he could get two or three thousand

dollars from, and then they inquired of witness whether if they were a little short he would help them out. He then repeated to them that he had not come up here for anything like that, and wished he had not got into it, but if they lacked a little he would help.

"Cobb and Johnson then returned to Colorado Springs. There Johnson remained, ostensibly to see his friends, Price and the manager, Thompson. Ansel and the witness, Cobb, took their departure for Texas, the witness returning to his home. Some fifteen days later witness received a letter from Johnson, saying they would be ready for the other race on the first. The place where the second race was to be run had not been determined, but was finally settled at Aurora, Mo.

"Johnson came to Corrigan to visit Cobb, and represented to him that he had only been able to raise $2,000, and Thompson had only raised $1,000, and that everything was off unless the witness Cobb could get up the remaining $17,000, at the same time assuring him it would be all right. The witness says he studied about it. That he already had $10,000 in it, and had full faith in his friend, Johnson, who claimed he knew Harry Price well, and what he could do, and that Ben could beat Harry, and that everything was all right. The witness then went to Houston, got the $17,000, and in company with Johnson went to Aurora, Mo,. where he met the same party he had met in Utah and Colorado Springs, with the addition of the defendant Ryan, and some others. After reaching their hotel at Aurora, Thompson came in, and asked if witness was going to help them out. Witness told him he had the money, but was a little doubtful about it; that he was afraid something was wrong. Thompson replied that he knew Ansel could beat, and that witness need not doubt a thing in the world, to go ahead and put his money up, and he would assure him his money was all right and safe. Thompson gave witness the $3,000, and witness added $17,000 to it, and put it up.

"In this race Price again won.

"H. M. Lary, a banker, testified that he was induced to participate in a footrace which was at Hot Springs, Ark., early in November, 1902. The enterprise was first tendered to him by one Dr. Goddard and Lucius Hindman at the home of witness in Hillsboro, Texas. They made substantially

the same representations to Lary that they made to Cobb, stating that the club was going to lose a lot of money, and that he (witness) was needed for the purpose of betting money to be furnished him by others. He was to risk none of his money, and was to receive 25 per cent. of the winnings. He was also requested to carry along bankable paper for the purpose of 'making a showing.' The runners in this case were Hindman and Clark, Hindman being the runner for the club, and Clark was supposed to be able to beat him. After negotiations for a week or ten days, the witness and Hindman started for Colorado Springs, and were joined at Fort Worth by Clark. Upon arrival at Colorado Springs, Hindman stated that the other boys were over in Utah, and that they had better go up there. Hindman and his associates were to pay all expenses, and Lary was to do nothing further than bet such money as was furnished him. He carried with him letters of credit and drafts issued by the First National Bank of West Texas, and made arrangements to wire for any amount of money he wanted. Not being able to have himself identified at the bank, the witness declined to remain long enough to have money sent him by express, and then Scott (really the appellant, R. H. Williams) told him that unless he had the money, the matter had better be off. It was so declared, and the witness returned home. After his return to his home, negotiations were opened again by Hindman, with the proposition that they should go to Hot Springs, Ark., where the millionaire club was supposed to be temporarily sojourning. He traveled to Hot Springs in company with Goddard and Clark. Hindman joined them at Hot Springs on their arrival November 2, and they remained here three or four days, during which time the witness had $10,000 placed to his credit in a Hot Springs bank. The witness became impatient at the delay of three or four days, and was finally told by Scott (Williams) that he would have to bet some money of his own. The witness refused, and told him the proposition was he was to be given $3,000 to start with, and when that was furnished to him he was ready to bet it. Scott was the stakeholder. A race was arranged for $5,000 a side, and $2,000 of the $3,000 furnished witness was put up as a forfeit. Witness was finally induced to put into the purse $5,000 of his own money, upon the assurance of the appellants that it would be handed back to him. The man

Clark claimed to have the money to return to him, but Clark afterwards bet the money that witness supposed was to be handed back to him. The witness' suspicions became somewhat aroused then, and he went back to his hotel, and was followed by his friend Hindman, who told him that they were about to get in trouble. Previous to this, some one had claimed that in summing up the money he was short $500, and insisted upon Scott counting it to see if there was not a mistake, and as a lot of it had been taken out and re-bet, it was a terrible catastrophe witness was about to get in, as he expressed it, and he went back to the hotel, saying he was done with it, and they might count it. He was followed by Hindman, Goddard and Clark, who showed him the fix witness was about to get Scott in, saying it was a pity to send him to the penitentiary, Goddard saying Scott was his cousin. Hindman protested his great friendship for the witness, and wanted the witness to go back, and make the $5,000 forfeit good, which required $3,000 in addition to the $2,000 originally staked. Witness then submitted the matter to Clark as to whether or not he could beat the other fellow, and whether he aimed to do it, etc., and Clark reassured him to the extent that witness went to the bank, got the $3,000, and the race was had. Hindman and Clark were the racers, and Clark was safely ahead ten or twelve feet and within forty feet of the finish, when unfortunately he fell down. He appeared to be badly hurt, and the others were greatly excited and regretful over it, and would not have had the fall for $50,000, etc. The witness was thus swindled out of $8,100. There were no spectators at the race, the appellants intimating that it would have an ill effect upon their moral standing for it to be known that they were engaged in any sort of sporting. The usual proposal of another race was made to witness. Scott and Hindman agreed to get $10,000, and run the race over at Dallas, Texas. They separated, and the witness returned home, and, as he could not be induced to finance the second race, it was never held.

"The witness, upon cross-examination, emphasizes the proposition that he was not to bet a dollar of his money. Admits he understood the stake money was being bet over and over. Upon being pressed as to whether he understood his money would be lost, if it was lost, witness said there was no understanding that it would be lost. The understanding was positive that Clark was

to beat Hindman, and that the club had no showing, and no one figured on losing at all. Witness also testified that he told the gentlemen that he would not bet his money against another man's. trick, and that he had never agreed to bet a cent until they took it out and agreed to return it to him, that he had confidence in Clark, and it was agreed his money was to be taken out of the bag and given to him, and he would give it to witness. Witness. understood the race was a sure thing in his favor.

"J. H. Guinn testified to a similar transaction participated in by R. H. Williams, Clark and others, in which he lost $2,000, but the race in his case was never run, due to the fact that he only had $2,000 in Hot Springs, and returned to his home in Arkansas City, Kansas, for the purpose of raising $7,000 more. He was induced to put his $2,000 in, just as the others, by Gibson, one of the footracers, showing him he had $5,000, and would return it to him immediately after the witness put in his $2,000. Gibson then accepted a bet, and put all of his money in. The usual claim of somebody having bet $500 more than was accounted for was made, and the usual disturbance and demand for count was had. After the witness went home to raise more money, one of his friends, whom he approached, being wiser than witness, informed him that he was being swindled. This resulted in his friend, Gibson, who had inveigled him into the scheme, being forced to confess all of the details, and he admitted to witness that it was a fake game, that he was carried down there for the purpose of robbing him, but that he did not think that $2,000 would hurt the witness, and that was the last seen by witness of his friend Gibson."

The court instructed the jury to return a verdict in favor of the plaintiff for the amount sued for, which they did: and judgment was rendered accordingly.

Defendants insist that, in the transactions detailed by the witness Cobb, the plaintiff is *in pari delicto* with them, and cannot· recover. This is their only defense.

In what wrong or crime were the plaintiff and defendants *in pari delicto?* If any; it was a conspiracy by the defendants to defraud the plaintiff and to steal his money; to obtain by deceit and falsehood the money of plaintiff by inducing him to believe that a foot race was to be run, and that they were actually wager-

ing their money, one against the other, upon it, and to induce him
to believe he was betting upon a foot race. He did not partici-
pate in this conspiracy, and could not possibly have done so. He
did put the money in the hands of one of their number as a wager
upon one of the racers with the assurance that he would be sure
to win. But the race was never run. Two men ran, but, accord-
ing to a previous understanding, the one upon whom he staked
his money fell down, and the other passed out ahead, and was
declared the winner. He did not bet upon such a race. There
was no trial of the speed of the racers, which is necessary to con-
stitute a race. There was no uncertain event to constitute a
wager. It was determined and understood what the result of the
pretended race would be before it was made. By fraud and
deceit they caused him to make a pretended wager, and robbed
him of his money, pretending that he had lost it. He might have
intended to wager, if he had the opportunity, but intention with-
out any act to carry it into effect does not constitute a crime or
a wrong; and he was not *in pari delicto* with the defendants.

   *Webb* v. *Fulchire,* 3 Iredell, Law, 485, 40 Am. Dec. 419, is
similar to this case in some respects. In that case the bet was
that the plaintiff could not tell which of three cups covered a cer-
tain ball. The defendant put the ball under a particular one of
the cups. The plaintiff selected that cup, as the one under which
the ball was. The defendant raised that cup, and the ball was
not there. "The ball was, by deceit, not put under the cup, as
the defendant had made the plaintiff believe, and under which
belief he had drawn him into the wager; or that, after it was so
placed, it was privily and artfully removed, either before or at the
time the cup was raised." Chief Justice RUFFIN, speaking for the
court, said: "Such a transaction cannot for a moment be regarded
as a wager, depending on a future and uncertain event; but it was
only a pretended wager, to be determined by a contingency in
show only, but in fact by a trick in jugglery by one of the parties,
practiced upon the unknowing and unsuspecting simplicity and
credulity of the other. Surely, the artless fool, who seems to have
been alike bereft of his senses and his money, is not to be deemed
a partaker in the same crime, *in pari delicto,* with the juggling
knave who gulled and fleeced him. The whole was a downright
and undeniable cheat; and the plaintiff parted with his money

under the mistaken belief that it had been fairly won from him, and, therefore, may recover it back." See *Wright* v. *Stewart,* 130 Fed. Rep. 905.

This case and *Webb* v. *Fulchire, supra,* while the facts are unlike, are based upon the same principle.

Judgment affirmed.