## PETER FALKENBERG V. JACOB H. ALLEN.

(Filed February 13, 1907.)

1. CONTRACTS Gambling—Recovery on, When. Where a number of persons conspire together to perpretrate a confidence game and work a swindle upon a victim by pretending to bet upon a foot race, and they induce the victim to believe that the race is fixed and that his money will only be used to put up against those who bet upon the opposite side, and that the stake-holder will return it to him as soon as the opposite betters put up their money, when in fact the runners and all the others connected with the conspiracy intend that the victim shall lose his money and the fake race is only used and run to induce him to place his money in their possession so that they can pretend that he lost his money and thus cheat and swindle him: Held: That although he may be in pari delicto with the other conspirators, he may recover from the so called stake-holder where he denounces the scheme and demands of the stake holder his money before the race is run.

2. SAME—Same. One who deposits his money with a stakeholder under an arrangement with the promoters of a fake foot race scheme, and in the belief that it is to be bet upon a "sure thing" winner and for the purpose of fleecing those who bet on the other "runner", but who in fact is himself being duped by the promoters who are all into a conspiracy to rob him of his money, may, although engaged in a wrongful purpose, recover back his money from the stakeholder in case he repents and demands the return of his money before the stakeholder parts with it.

(Syllabus by the Court.)

*Error from the District Court of Grant County; before James K. Beauchamp, Trial Judge.*

P. C. Simons, for plaintiff in error.

C. E. Elliott, for defendant in error.

Opinion of the court by

BURFORD, C. J.: This cause brings into prominence the last lap of that class of infamous foot races which have been made notorious in the southwest in the past few years for the frauds perpetrated by their promoters upon unsuspecting victims possessed of more greed than sense. In this case the scheme to prey upon the Kansas farmer-banker, and satisfy his avarice, was concocted and executed by a cabal of frequenters of prize fights, dog fights, poker games and saloons, who were ambitious to enter the more accomplished class of confidence sharks. The combination included Korndorfer, the booze dispenser, who provided the cash to put up against that of the victim and took his "cut" of the salvage; Falkenberg, the butcher and owner of champion dogs, who acted as stakeholder for accommodation where the races were "square" but who demanded compensation if the race was a "sure thing race;" Laux, the plasterer, who had just recently married and who needed a little money for domestic uses and was willing to do the betting if the victim would furnish the money; Beatty, the swift man, who was out of a job, and wanted a little money to redeem his diamonds from Korndorfer's bar, that he might in proper style, attend his sister's wedding in the far north, and who was willing to throw the race for an equal divide in the spoils; Garrett, the stranger, whose record was not known, and who could outrun Beatty if there was more in it for him than to throw it, and the rounders, Howell and Edson, who bet Korndorfer's money on the sure thing arrangement. Allen, the gullible, was visited by Beatty and solicited to finance the scheme to defraud the Medford sports. Beatty claimed that

he had won several foot races and was a favorite in Medford, but that he could send and get a man who could outrun him, and that if Allen would furnish the money to back the imported sprinter, he would get the Medford speculators to back him; that he would let the stranger win, and Allen would have a sure thing to win the bets. Allen was finally, after four visits by the envoy, induced to visit Medford, and was met by Beatty and conducted to a room in the hotel where he met his former acquaintances, Falkenberg, Laux and Garrett, the imported racer. It was then disclosed to him, after ascertaining that he had brought along $480 to invest as working capital in the proposed enterprise, that he should turn over the money to Laux, who was to go to Korndorfer's saloon and offer to back Garrett against Beatty, the favorite; that he would select Falkenberg as stakeholder and put up Allen's money in the hands of Falkenberg, who would as soon as the money of the other party was put up, return Allen's money to him. Garrett agreed to win the race and Beatty agreed to throw the race to Garrett, and then Falkenberg was to divide the balance of the winnings—after paying Allen's expenses and the expenses of each of the promoters—into four equal parts to be shared by Falkenberg, Laux, Beatty and Garrett. Allen was not to take any of the winnings, but was assisting to relieve his needy and solicitious friends from their impecuniosity. The plan was agreed upon; Allen counted out to Laux twenty-four $20 bills of the lawful currency of the realm. Laux then went to the headquarters of the Medford sports, Korndorfer's booze palace, and proposed to bet $450 that he could match a man against Beatty in a foot race who could beat him.

It happened that Howell had just that amount in his pocket at that time, which had been given to him by Korndorfer that forenoon to back Beatty in a foot race· Howell accepted the challenge and demanded to know who would hold stakes. Laux named Falkenberg and he accepted the trust and took the $900 into his custody to be paid to Howell if Beatty won the race, but to Laux if Garrett won. Laux then proposed to bet twenty-five more, and this was covered by Edson, another of Korndorfer's patients who happened to have that amount on hands, an unusual circumstance, and this $50 additional was deposited with Falkenberg upon the same terms.　Preparations were than made for the race; the principals, their friends, admirers and backers were preparing to repair to the race course, when some meddlesome Medfordite intimated to Allen that the race was a put-up job to beat him out of his money.　Allen immediately repented; he did not desire to risk his funds except upon an absolute certainty that he would not take any risks.　He went to Falkenberg and demanded the return of his money; Falkenberg told him that he could not then get away from the other fellows; Allen followed the crowd to the race cource and kept demanding his money, both before and after the race was won.　He not only demanded it of Falkenberg, but he called upon witnesses to take notice of his demands.　No attention was paid to his demands, the race was run, and Beatty, the Medford favorite, won the race, as it was at all times intended by the conspirators that he should do.　Falkenberg immediately hastened to Korndorfer's saloon and paid all the stake-money, $950 to· Korndorfer, who took out his original investment and divided Allen's $450 with the participants in the scheme.

This can only be termed a confidence scheme, the sole object and purpose of which was to trick and defraud Allen out of his money. While he was willing to enter into an unholy and infamous alliance to beat the other fellows who backed Beatty, and to use Beatty to aid in the infamy, he never had any chance at any time to win anything. He was a victim of cool, calculating, cruel, confidence criminals, who never intended at any time to have a foot race for the trial of speed, but who from the inception of the scheme to its termination intended to do just what they did accomplish—trick and defraud Allen out of his money. And though Allen, when he found that he was liable to be victimized, repented and demanded the return of his money, it was not intended that their efforts should be thus foiled, and they went through the farce of running a race and declaring the results.

Upon this state of facts what is the law? The trial court gave Allen a judgment for the amount of his deposit, $480, against Falkenberg, the stakeholder. Falkenberg appeals and invokes in his behalf the well-known doctrine that courts will not lend their aid to a person to assist him in recovering from another where they are both engaged in an unlawful business or one which public policy or sound morals forbid. They are said to be in pari delicto, and the law will leave them where they have placed themselves. This doctrine is the firmly established law of the courts of this country, and the only difficulty lies in its application. It has been held by this court that one who wagers his money may recover it from the stakeholder at any time before it is paid out. Dunn v. Drummond, 4 Okla. 461. The plaintiff

in error has cited quite a number of cases in support of his contention that Falkenberg was not a mere stakeholder, but upon the testimony of Allen, himself, he was engaged in a scheme to defraud those who might be induced to put up their money upon the event of a race which was not to be a race but a pre-arranged plan to trick the other fellows out of their money, and being *in pari delicto* he cannot recover in this action, and this contention is supported by a number of decisions.   But the identical scheme presented by the facts in this case has been before some of our leading courts in recent years, and has had careful and extended consideration, and it has been held that such cases present an exception to the rule contended for, except that the case at bar is more favorable to the right of recovery.   In some of the other courts which we shall refer to, the money was not claimed or demanded until after the race was run, and the money forfeited according to the terms of the wager, and in one case the action was one for damages against a bank which, through its officers, participated in the fraud.

This question upon a similar state of facts was before the United States circuit court, district of Missouri, southwest division, and was decided by that venerable jurist, Justice John F. Phillips.   An exhaustive research of the authorities is gone into, and the distinction pointed out between *in delicto* and *in pari delicto,* and the court held that while the plaintiff was *in delicto* by consenting to assist in a scheme to defraud others, that he was not *in pari delicto* with the conspirators, and therefore entitled to recover back the sum which the conspirators persuaded him to entrust to the possession of one of their number as a stakeholder, not to bet

on the race, but to be used to make a showing in the event of the count of stake-money being called for by one of the feigned bettors; and it was further held in the same case that if the plaintiff demanded back his money before the pretended race was run, that an action would lie to recover it, and the plea of moral turpitude would constitute no defense. *Wright v. Stewart, et al.,* 130 Fed. 905. This same case was taken to the circuit court of appeals for the 8th circuit, and is reported in 147 Fed. Rep. 321, and Judges Hook and Adams, concurred in an opinion affirming the decision of Judge Phillips. Judge Sanborn dissented, and supports his views by an able and well reasoned opinion. The court after reviewing at great length the authorities applicable, held that although the plaintiff thought that he was participating in a scheme to defraud others, that he was doing so existed, not in fact but only in his own mind, and all that he did operated only to defraud himself; that he was not *particeps criminis* in any unlawful proceeding, and was not *in pari delicto* with the swindlers who defrauded him, and was not deprived of his right to recover his money·

The same confidence scheme or fake foot race enterprise was before the supreme court of Missouri in the celebratd case of *Hobbs v. Boatwright and The Exchange Bank, et al.,* 195 Mo. 693. In this case Hobbs, a prosperous but verdant Oklahoman, was enticed over the border to Webb City, Mo., and there allured into putting up $6,000 upon a sure thing foot race, which was to be so fraudulently conducted as to make it sure that Hobbs would win and the other fellow lose. Hobbs was fleeced out of his money and sued the conspirators to recover it back. The court in discussing the case said:

"The difficult question in this case is, upon which side of this controversy should the law of public policy be applied? Plaintiff schemed with men, as he supposed, to defraud others; his only disappointment was that the men with whom he thought he was scheming, had really schemed to defraud him, and they did fleece him to the sum of $6,000. If we should now say to the plaintiff, you cannot recover because although you did not accomplish what you intended, yet your purpose was to assist those men to defraud others and therefore you are as guilty as any of them, we would by so saying allow the gang and their aiders and abettors to go free, retain the booty and set their traps again. The doctrine that courts will not aid a plaintiff who is *in pari delicto* with the defendant is not a rule of universal application; it is based on the principle that to give the plaintiff relief in such case would contravene public morals and impair the good of society. Therefore the rule should not be applied in a case in which to withhold the relief would, to a greater extent, offend public morals. To promote the good of the public is the highest aim of the court in the application of this doctrine. Under the head of exceptions to the rule in 9 Cyc. p. 550, it is said:

"Although the parties are *in pari delicto,* yet the court may interfere and grant relief at the suit of one of them where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with the defendant· But here the guilt of the parties is not considered as equal to the higher right of the public; and the guilty party to whom relief is granted is simply the instrument by which the public is served. A question of what is public policy in a given case is as broad as a question of what is fraud in a given case, and is addressed to the good common sense of the court."

It was further said:

"In the case before us we hold that public policy is ad-

vanced by allowing the plaintiff to recover the money of which he was defrauded."

The same fake foot race transactions were before the supreme court of Arkansas, *Lockman v. Cobb*, 91 S. W. 546, and the court said:

"In what wrong or crime were the plaintiff and defendants *in pari delicto?* If any, it was a conspiracy by the defendants, to defraud the plaintiff and to steal his money; to obtain by deceit and falsehood the money of plaintiff by inducing him to believe that a foot race was to be run and that they were actually wagering their money, one against the other, upon it, and to induce him to believe he was betting upon a foot race. He did not participate in this conspiracy, and could not possibly have done so. * * * * * * By fraud and deceit they caused him to make a pretended wager and robbed him of his money, pretending that he had lost it. He might have intended to wager if he had the opportunity, but intention without any act to carry it into effect does not constitute a crime or wrong, and he was not *in pari delicto* with the defendants."

From these cases it appears that the courts of the country are not in accord as to when one shall be held to be *in pari delicto,* or under what particular state of facts courts will, in the interest of public policy, make an exception to the rule. In each case where a court has been called upon to determine the right of a victim of the fake foot race conspirators to recover his money, such victim has upon some pretext been permitted to recover. In the case at bar it is not necessary that we shall adopt the extreme views advanced by the courts in the cases referred to *supra.* In this case there was evidence reasonably tending to establish the fact that Allen demanded the return of his money from Falk-

enberg before the race was run and while Falkenberg still had the money, and while this testimony was contradicted, we think every reasonable intendment should be indulged to sustain the verdict of the jury. The court instructed the jury that if Falkenberg knew that he was a stakeholder holding Allen's money, and if they found that he repented and demanded the return of his money, that they should return a verdict in his favor. The cause was tried upon the theory that if he was *in pari delicto* with the other parties in a scheme to defraud those who bet against his money, then he could not recover unless he notified the stakeholder that he did not desire to go on with the scheme and demanded the return of his money before the race had been run or before the money was parted with by the stakeholder, and on this theory the jury found in favor of the plaintiff. There is ample evidence to sustain this verdict and as this court has in the case hereinbefore referred to, laid down the rule that one who deposits his money with a stakeholder as a wager upon the result of some event, may recover his money from the stakeholder, we adhere to the doctrine of that case.

The judgment of the district court of Grant county is affirmed, at the costs of the plaintiff in error.

All the Justices concurring·