[Civ. No. 726.   Second Appellate District.—January 6, 1910.]

## EUGENE SCHMITT, Appellant, v. W. S. GIBSON, Respondent.

Assumpsit—Loss of Money in Swindle — Failure in Counter-attempt of Plaintiff to Swindle—Proper Denial of Relief.—In an action of *assumpsit* to recover money lost in a swindling transaction, in connection with which it appears that plaintiff with others attempted to swindle the parties who swindled him, and failed in such attempt, by reason of being swindled, the court properly denied him any relief.

Id.—Maxims—Applicable.—The principle applicable to the denial of relief in such cases is embodied in the maxims, *"Ex pacto illicito non oritur actio,"* and *"Ex dolo malo non oritur actio,"* in the application of which the court must deny him its aid in the pursuit of that which he has lost.

Id.—Plaintiff Asserting His Own Turpitude—Statement Out of Court—Victim of His Own Swindle.—When a plaintiff asserts his own turpitude he states himself out of court. If in attempting to swindle another he becomes the victim of his own arts, it may become a question of morals or of honor which is the more culpable; but courts of law entertain no discussion on the subject, but terminate the controversy by shutting its doors in the face of the intruder.

Id.—Relief Against Executory Illegal Contract—No Relief from Executed Contract.—It is true that while an illegal contract remains executory, relief should be awarded to one who repudiates

the contract because of its illegality; yet where plaintiff did not withdraw, nor attempt to withdraw, from the transaction until after the condition on which he was to be declared winner or loser was fully executed, and until after his money was declared lost, under these circumstances the law accords no *locus penitentiae.*

Id.—General Conspiracy of Swindlers to Defraud—Public Policy —Assumpsit—Individual Case.—Whatever rule of relief may be applied in an action for fraud and deceit by a person engaged regularly in a continuous scheme to defraud in various parts of the country by getting the dupe to think he is swindling others, on the ground of public policy; such a rule is not applicable in an action of *assumpsit* based on a single transaction in which plaintiff was engaged in a swindling scheme, and in which the only evidence of another such transaction was that of an individual case which occurred in Omaha one month later, which could not justify relief upon such ground.

Id.—Best Promotion of Public Welfare.—In the judgment of this court, the public welfare is best promoted by adhering to the rule established in this state a half century ago, at which time the doors of the court were declared closed against one seeking redress under circumstances identical with those presented here.

APPEAL from a judgment of the Superior Court of Los Angeles County. Chas. Monroe, Judge.

The facts are stated in the opinion of the court.

Clement L. Shinn, and Wesley H. Beach, for Appellant.

Earl Rogers, Paul W. Schenck, and W. H. Dehm, for Respondent.

SHAW, J.—Plaintiff appeals on the judgment-roll from a judgment rendered in favor of defendant.

The complaint states an action in *assumpsit* for money had and received to the use and benefit of plaintiff by defendant Gibson, John Doe, Jane Doe, and Richard Doe. No service was had and no appearance made by the defendants sued under the fictitious names inserted in the complaint. Gibson, answering for himself alone, denied the allegations of the complaint.

The findings are voluminous, and consist of a narration of facts connected with a fake pugilistic encounter which one Maxwell, a cousin of Gibson, had arranged between two gen-

tlemen, one of whom was known as Mr. Casey and the other as Mr. McCormick. Plaintiff was made the dupe of his pretended co-conspirators, with whom he knowingly joined in an undertaking to swindle others, all of whom were in fact parties in a conspiracy with Gibson to separate plaintiff from $13,000 cash which he had derived from a sale of property. Plaintiff's effort to "get rich quick" failed, and with an awakening conscience which enabled him to distinguish between right and wrong, and firmly believing that he had been wronged, he brought this action to recover the money lost.

Briefly stated, the facts are that plaintiff and Gibson were partners in the hotel business in Los Angeles. The latter, learning that plaintiff was about to sell some property, informed him that his cousin, George Maxwell, had fixed a fight in Denver, and that a good deal of money could be obtained on this fake fight; that Maxwell had trained both the fighters and was to be stakeholder and referee of the fight and would bet his own money on the result. Plaintiff and defendant went to Denver and were there informed by Maxwell that he (Maxwell) had for ten years been in the employ of Barnes and Pomeroy, two wealthy Pittsburg men, who would bet heavily on McCormick, one of the pugilists; that he (Maxwell) had never had a chance to make any money on the side and never made anything but his salary; and it was then arranged that plaintiff would bet Maxwell's money on Casey, for the reason that Maxwell, being both stakeholder and referee, could not bet. Plaintiff's money was in St. Louis, and he was informed that as a condition of his betting for them he must transfer his money to Denver in order to make an exhibition of his responsibility to Barnes and Pomeroy. Plaintiff did so, and thereupon, in a suite of rooms occupied by plaintiff and Gibson, the betting commenced. There were present plaintiff, Gibson, Maxwell, Barnes, Casey, McCormick and one unknown person. As the money was bet Gibson took it to Maxwell, who remained in an adjoining room. Plaintiff did not bet any of his money on the first day, but used that put up by Maxwell, a part of which was money already used and held by him as stakeholder, and which was by Gibson returned from Maxwell to plaintiff to bet against Barnes and Pomeroy. On the second day Gibson

and Maxwell advised plaintiff to bet his own money, assuring him that it was fixed for Casey to win the fight. He did so, and also continued to put up money furnished by Maxwell and Gibson, most of which was that already bet and placed in the hands of Maxwell as stakeholder. Plaintiff bet his own money because Maxwell was to be the stakeholder and referee and was betting his own money on Casey, and because he had been told by Maxwell and Gibson that the fight was fixed for Casey to win; and all the time he was betting he thought he was swindling Barnes and Pomeroy, with whom he was betting, and he went into the scheme for that purpose. The truth was, however, that all of the parties, including Gibson, were in a conspiracy to swindle the plaintiff, and the money that was bet against plaintiff never actually changed hands, but was simply used for the benefit of the conspirators to induce the plaintiff to bet his own money. In all, plaintiff bet $13,000 of his own money, all of which was placed in the hands of Maxwell as stakeholder. Thereupon, they all went to a vacant house provided by the conspirators, and Casey and McCormick began the fight. In the first two rounds Casey appeared to have the best of it; in the third round, however, Casey stepped into a hole in the floor, left for a heating register and which had been covered up by a carpet, by reason of which he fell, and Maxwell counted him out. This hole was known to all the parties except plaintiff, and Casey stepped into it designedly. Thereupon, plaintiff demanded the return of his money, but did not claim any fraud. Maxwell told him he could not return the money, as it had been bet on the fight. After a conference between Maxwell, Barnes and Pomeroy, it was stated that on account of the accident to Casey the fight could be had over again, provided plaintiff would put up an additional $10,000 on Casey, which, together with what he had theretofore bet, should constitute the total stakes on the proposed fight; and they generously gave plaintiff ten days from that date to put up $2,500, and until the 10th of June to put up the remaining $7,500. Plaintiff and Gibson returned to Los Angeles, where Gibson borrowed of plaintiff $1,900, to which he added $600 of his own money and procured a certified check which he pretended to plaintiff he had

sent to Maxwell as part of the $10,000; but in truth, however, the same was not sent at all, and it was not intended that any further fight should take place. On May 23, 1907, Maxwell telegraphed that Barnes had forced the keys of the safe-deposit box from him, and that Maxwell was on the way to Mexico. Other conspirators notified plaintiff that Maxwell was running away with the money, and, before June 10th, a letter was received from Maxwell, stating that Barnes had taken the money away from Maxwell and that he (Maxwell) was going to Central America.

The court further finds as follows: "The truth is that the conspirators appropriated the money of plaintiff to themselves and divided it between themselves, but there is no evidence that Gibson, personally, got any of it, and the finding will be that he did not get any of plaintiff's money." There are other findings to the effect that no fight was in fact had and no money paid to Barnes and Pomeroy upon the claim that they had won the same as a result of the fight, but was appropriated by them as above stated. That all of the representations, pretenses, acts and statements of the parties were false and untrue, and at all times known to be false and untrue; that Barnes, Pomeroy and Maxwell did not in fact bet their money on any contest, but only pretended to bet for the purpose of inducing plaintiff to part with his money and as a part of their scheme to defraud him; that plaintiff believed in the truth of the representations, pretenses and statements of the defendant and relied thereon, and believed that he was going to swindle those with whom he was betting, and went into it wholly for that purpose. That in attempting to swindle others plaintiff was the victim of defendant and the others mentioned who swindled him. There is a further finding that the same parties, about a month later, perpetrated a similar swindle upon one Dr. Vanderbeck, by arranging a wrestling match between Casey and McCormick in the city of Omaha.

As conclusions of law, the court finds that the plaintiff has no standing in a court of law, and rendered judgment accordingly.

The conclusion of the court is fully sustained by the case of *Abbe* v. *Marr,* 14 Cal. 210, wherein the facts were almost

identical with those in the case at bar. In that case the means whereby the swindle was perpetrated was a horse-race, the victim being assured by the conspirators that it had been fixed for his horse to win, and upon such representations and believing them to be true, he was thereby induced to bet his property. He brought an action to recover, and in disposing of the case on appeal the court said: "No court of justice can listen to such a case. When the plaintiff asserts his own turpitude in this way, he sends his case out of court. If, in attempting . . . to swindle another, he becomes the victim of his own arts, it may become a question in morals or in honor, which party is the more culpable; courts of law entertain no discussion on the subject, but terminate the controversy by shutting their doors in the face of the intruder."

Waiving the finding to the contrary, and conceding that Gibson did receive plaintiff's money, it, nevertheless, devolved upon plaintiff to establish facts showing that it was obtained in a manner that imposed upon Gibson the duty of returning it. Plaintiff seeks to do this by showing that as a means of accomplishing the robbery of Barnes and Pomeroy it was placed in the hands of Maxwell under an illegal agreement made between Maxwell, Gibson and himself, to the effect that they should and would join with him in swindling Barnes and Pomeroy. Had they kept their agreement, there would have been no cause for complaint on his part. Failing to do this, he brings an action based upon the breach of this unholy agreement, to which he deliberately and knowingly became a party. The principle applicable to relief in such cases is embodied in the two maxims, *"Ex pacto illicito non oritur actio,"* and *"Ex dolo malo non oritur actio,"* in the application of which the court must, upon plaintiff's own statement, deny him its aid in the pursuit of that which he has lost. This is not out of consideration for the defendant, but due to the fact that "where both parties are equally in fault, the condition of the defendant is preferable."

Appellant insists, however, that while he was *in delicto,* he was not *in pari delicto.* There is nothing in the findings which indicates that in point of intelligence, general knowledge and experience plaintiff was not the equal of Gibson. It does not appear that his participation was, in a legal sense,

due to imposition, duress, or undue advantage practiced upon him by Gibson or his associates. He deliberately joined with Gibson and others with the avowed intent and purpose of robbing the others, and his only cause for complaint is that there was wanting on Gibson's part the "proverbial honesty among thieves." In some slight degree, plaintiff may be less culpable than defendant, but in the absence of some practice which gave the latter an undue advantage, the courts, as said in the Abbe case, will entertain no discussion as to the degree of culpability.

Appellant further insists that he did not engage in a gambling transaction; that he did not lose his money on a wager; and that he did not engage in a conspiracy to defraud others. It is true, he says, that he *thought* he was doing all these fraudulent and wicked things whereby he intended to and supposed he was assisting in the robbery of Barnes and Pomeroy, believing they were the wealthy dupes of himself and associates. The ground upon which courts withhold relief in such cases is the moral turpitude of the party seeking it. Can it be said that the turpitude attending the act of theft is less because the supposed jewels stolen were in fact worthless paste?

Appellant has cited a number of authorities wherein the courts, under facts somewhat similar, have sustained the right of relief to the one defrauded. An examination of these cases, however, shows that the decisions therein were all based upon facts wanting in the case at bar. It is true that the opinions contain dictum which supports the position of appellant, but it was unnecessary in disposing of the appeals.

In the case of *Wright* v. *Stewart*, 130 Fed. 905, plaintiff's money was not placed in the hands of a stakeholder as a wager, but in connection with a matter wholly collateral thereto. Moreover, the plaintiff stated that he was not betting it on the race, and before the simulated race occurred he demanded the return of his money, which demand was refused by the conspirators. Says the learned judge in distinguishing that case from the Abbe-Marr case: "With their own consent they put up their property as a wager, ran the race out, and after it was lost brought suit, and in the petition averred their own turpitude, whereas, here the plaintiff never consented to put up his $5,000 on the footrace, and demanded

it back before the simulated race was run. . . . The law accorded to him his *locus penitentiae,* and when he demanded back his money prior to the proposed race, the law should respect his withdrawal." On appeal to the circuit court of appeals, this decision was affirmed by a divided court, Judge Sanborn dissenting. (147 Fed. 321, [77 C. C. A. 499].)

So in the case of *Falkenberg* v. *Allen,* 18 Okl. 210, [90 Pac. 415], the plaintiff, upon representations that the result of a footrace was prearranged, placed his money in the hands of a stakeholder, who was one of the conspirators. Before the proposed race occurred he demanded the return of his money, which was refused. Relief was granted him because of his repentance and repudiation of the transaction before it was fully executed.

It is true that so long as the illegal contract remains, executory relief should be accorded to one who repudiates the contract because of its illegality. Appellant seeks to bring himself within this doctrine, and argues that "as long as the light holds out to burn, the vilest sinner may return." It appears from the findings, however, he did not attempt to retrace his steps until the light was extinguished—after the condition under which he should be declared loser or winner was fully executed. Not until Casey was counted out and McCormick declared the victor—and just how long does not appear—did he ask for the return of his money. Conceding such request, if made before the condition was executed, to constitute a sufficient repudiation, nevertheless, plaintiff did not withdraw, nor attempt to withdraw, from the transaction until after his money was declared lost. Under these circumstances, the law does not accord one a *locus penitentiae.*

In *Hobbs* v. *Boatright,* 195 Mo. 693, [113 Am. St. Rep. 709, 93 S. W. 934], the facts were almost identical with those in the case of *Wright* v. *Stewart,* 130 Fed. 905. There, as here, the dupe thought he was in a conspiracy to defraud others in a fake footrace, the result of which he understood to be prearranged. He bet $2,000 of his money, while an additional $3,000 was obtained from him by the stakeholder and his confederates by other means wholly collateral to the wager. Recovery was had for the entire sum. The action there was in form for fraud and deceit, it being alleged and proven that defendants had for a number of years engaged

in transactions of a like character in different parts of the country. In that case relief was granted upon the ground of public policy. In according the relief the court expressly stated that: "If the case at bar disclosed but one transaction, if we should shut our eyes to other transactions of like character that distinguished history of this Buckfoot gang, if our whole attention was confined to the scheme entered into by the plaintiff with Wasser and Fisher in Oklahoma and the *denouement* at Webb City, we could not say that one was less guilty than the other; it was a scheme of dishonest purpose and there is no justification or palliation of it, *and if there was nothing else in the case to make the offense of one more enormous than the other we would not listen for a moment to plaintiff's prayer for relief.*" It thus appears that the reasons which actuated the supreme court of Missouri in according relief were considerations of public policy based upon the fact that the defendants who had conspired to rob the plaintiff therein had combined for the purpose of engaging in, and were engaged in, the perpetration of similar frauds throughout the country. The action here is not one for conspiracy to defraud, but in *assumpsit* to compel the defendant Gibson to disgorge that which plaintiff claims he has received. Under this form of action, conceding that evidence of facts connected with the particular transaction whereby the money was lost might be introduced, nevertheless, the fact that the defendants engaged in a similar transaction at Omaha about a month later does not justify according relief in this case upon such ground.

In *Lockman* v. *Cobb*, 77 Ark. 279, [91 S. W. 546], relief was granted plaintiff, who had lost his money in wagering it upon a fake footrace. The transaction, however, did not involve him in a conspiracy having for its purpose the defrauding of others; on the contrary, he supposed the race was to be an honest test of speed. The ground of recovery in that and the like cases of *Webb* v. *Fulchire*, 25 N. C. (3 Ired.) 485, [40 Am. Dec. 419], and *Preston* v. *Hutchinson*, 29 Vt. 144, appears to be based upon the fact that the game was not played "according to Hoyle," but an unfair advantage taken by reason whereof plaintiffs had no chance to win. Clearly, if the gaming, whatever be its character, is conducted according to rule, the one losing money in a wager

upon the result would be denied any remedy at law. It is difficult to perceive how he could be entitled to greater consideration because of cheating if the game was conducted unfairly, or the result prearranged. If such facts shall enter into the consideration of one's right to recover money lost in betting, then it inevitably follows that the courts must sit as arbiters of every game upon which money is wagered, act as judge of the race-course, and umpire the prize-ring. (*Babcock* v. *Thompson*, 3 Pick. 446, [15 Am. Dec. 235].)

To our mind the public welfare is best promoted by adhering to the rule established in this state a half century ago, at which time the doors of the courts were declared closed against one seeking redress under circumstances identical with those presented in the case at bar. (*Abbe* v. *Marr*, 14 Cal. 210.)

Judgment affirmed.

Allen, P. J., and Taggart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 7, 1910.